891 F.2d 458
 WILLIAMS, Wayne, Individually and as Administrator of the
Estate of Williams, Ronald K., Williams, Richard
v.
BOROUGH OF WEST CHESTER, PENNSYLVANIA, Green, John O.
Ferriola, Jennadi, Morris, William A. McBride,
Steven J. Chesko, William G. Martin, John D.
Appeal of Wayne WILLIAMS, Individually and as Executor of
the Estate of Ronald Williams, and Richard Williams.
 No. 89-1052.
 United States Court of Appeals,
Third Circuit.
 Argued May 26, 1989.
Decided Nov. 21, 1989.
Rehearing and Rehearing In Banc Denied Dec. 26, 1989.
As Amended Jan. 8, 1990.
 
 Joseph P. Green, Jr. (argued), Duffy & Green, West Chester, Pa., for appellants.
 Christine Mooney-Brenner (argued), Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for appellees.
 Before BECKER, STAPLETON and GARTH, Circuit Judges.
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 BECKER, Circuit Judge.
 
 I.
 A.
 
 1
 Since the Supreme Court decided its summary judgment trilogy,[1] appellate courts have increasingly been called upon to engage in difficult line-drawing exercises to determine whether a nonmoving party has adduced sufficient evidence to defeat a motion for summary judgment. The standard for this determination is more easily stated than applied:
 
 
 2
 [S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party....
 
 
 3
 ....[The summary judgment] standard mirrors the standard for a directed verdict ... which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed....
 
 
 4
 In essence ... the inquiry under each [standard] is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.
 
 
 5
 Liberty Lobby, 477 U.S. at 248, 250, 251, 251-52, 106 S.Ct. at 2510, 2511, 2511, 2511-12. On the one hand, this standard makes clear that, even though the right to a jury trial is implicated, see id. at 267, 106 S.Ct. at 2519 (Brennan, J., dissenting), a nonmoving party must adduce more than a mere scintilla of evidence in its favor, see 477 U.S. at 249, 106 S.Ct. at 2510,[2] and cannot simply reassert factually unsupported allegations contained in its pleadings, see Celotex, 477 U.S. at 325, 106 S.Ct. at 2553. On the other hand, the standard purports to leave undisturbed the traditional rule that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Liberty Lobby, 477 U.S. at 255, 106 S.Ct. at 2513. Summary judgment motions thus require judges to "assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide," id. at 265, 106 S.Ct. at 2518 (Brennan, J., dissenting), an inquiry that obviously must be done on a case-by-case basis.[3]
 
 
 6
 The inquiry becomes even more difficult when a defendant's liability turns on his or her state of mind. On the one hand, as the "reasonable jury" reference in Liberty Lobby suggests, circumstantial evidence alone must be sufficient to defeat summary judgment in some of these situations. Nothing in the trilogy suggests otherwise, and a contrary rule would immunize from trial all civil defendants who swear in affidavits that they lacked the requisite mental state, absent some rarely available "smoking gun." On the other hand, a nonmoving party in such a case cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect. " '[D]iscredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion.' Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 256-57, 106 S.Ct. at 2514 (emphasis added) (citation omitted). Such affirmative evidence--regardless of whether it is direct or circumstantial--must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance. Whether the quantum of circumstantial evidence in any particular case is enough to meet the Liberty Lobby standard sometimes requires us to make difficult, fact-specific, perhaps somewhat arbitrary judgments.
 
 B.
 
 7
 This civil rights action, brought pursuant to 42 U.S.C. § 1983 (1982), arises out of the suicide of Ronald Williams in the West Chester, Pennsylvania, police station. It presents a particularly difficult example of the general problem described above.
 
 
 8
 Plaintiffs Wayne Williams, father of Ronald Williams and administrator of his estate, and Richard Williams, twin brother of Ronald Williams, appeal from the grant of summary judgment for the defendants, the Borough of West Chester and a number of its police officers.[4] The appeal requires us to determine whether a genuine issue of material fact exists as to police officers' alleged deliberate indifference to the psychological needs of a prisoner.
 
 
 9
 A number of factors militate against summary judgment. The personal history of the decedent, which was marked by several bizarre previous suicide attempts, was known to many members of West Chester's 35-member police department, including members of the platoon in which the defendant police officers served. Even the Chief of Police had heard of Ronald's mental problems, although not the suicide attempts. The suicide attempts were part of the records of that platoon, and were read at its roll call. They were also known personally to the civilian dispatcher on duty on the night of the suicide. Nonetheless, the officers who had custodial responsibility for Ronald denied knowledge of the suicide attempts, either by word of mouth or from the roll call.
 
 
 10
 Because human beings often talk about bizarre behavior, a strong argument can be made that a reasonable jury could find that the custodial officers in this small police department did know about Ronald's history of mental problems. If they knew, their failure to remove Ronald's belt, in violation of the usual practice of the West Chester Police Department, or to take other suicide prevention measures, might well raise a genuine issue of material fact on the issue of deliberate indifference.
 
 
 11
 On the other hand, the custodial officers swore affidavits directly denying any knowledge of Ronald's past. At the time of the incident, West Chester had a population of over 18,000 people, and a thirty-five member force is not tiny. Officers work different shifts, and there is no evidence that the custodial officers were present when records of Ronald's past suicide attempts were read. Most important, Ronald's two most bizarre suicide attempts, see infra at 462, occurred six years before the events in question in this suit.
 
 
 12
 Although I believe that the question is extremely close under these circumstances, we will affirm the grant of summary judgment in favor of the two custodial officers, the civilian dispatcher (who had no custodial responsibility for prisoners), and the municipality.
 
 II.
 
 13
 The following facts are essentially undisputed. On April 18, 1985, West Chester Police Officer Jennadi Ferriola entered Thatcher's Drug Store in West Chester in response to a shoplifting complaint. In the store were Ronald Williams, his brother Richard Williams, and several other people. Richard was being detained by store employees for allegedly having committed a retail theft. Store employees informed Officer Ferriola that Ronald had been threatening people in the store. Police Sergeant William Chesko then arrived on the scene, and escorted Ronald from the premises, informing him that if he returned to the store he would be arrested. Richard was taken into custody on the shoplifting charge, and Ronald re-entered the store. Ferriola and Chesko thereupon arrested Ronald for criminal trespass. Ronald was handcuffed, placed in a police car, and taken to the West Chester police station. While Ronald was in the presence of the officers, in the police car and subsequently at the police station, he repeatedly stated that he did not steal anything and that he was not going to be arrested for something he did not do.
 
 
 14
 Upon arrival at the police station, Officer Ferriola took Ronald to the squad room, where Police Officer William Morris and Dispatcher Steven McBride were present. Ferriola removed Ronald's handcuffs and instructed him to empty his pockets and take his jacket off. While he was taking his jacket off, Ronald assumed a "combative position." Ferriola and Morris then seized him and placed him in a police cell. However, they failed to remove his belt, the usual practice of the West Chester police department.[5] Dispatcher McBride witnessed this struggle. Ronald was placed in the cell between 6:05 and 6:10 p.m. Shortly thereafter, he was heard banging on the cell block door and yelling.
 
 
 15
 Richard Williams was then brought into the station. Sergeant Chesko interrogated him about another crime for approximately five or ten minutes, and then placed him in a cell next to Ronald's. After Richard was brought into the station, but before he was placed in the cell, Officer Ferriola left the station on a dinner break. Ferriola stated in his deposition that it was his intention to arraign and release Ronald when he returned, and that he had intended to wait until that time to do so because he thought that Ronald needed time to calm down. Officer Morris went off duty at approximately 6:10 p.m. and left the police station fifteen to twenty minutes later. Sergeant Chesko left the cell block area at approximately 6:25 p.m. and left the station five or ten minutes later. After Chesko left, Dispatcher McBride was the only police department employee in the police station. He heard yelling from both of the brothers until approximately 6:50 p.m. McBride, who had no custodial responsibility for prisoners, did not check the cell block area while he was alone in the station, and from his work area it was difficult for him to see the cells where the Williamses were incarcerated.[6] Ferriola returned from dinner at approximately 7:00 p.m. At that time he found Ronald Williams dead, hanging from the ceiling by his belt.
 
 
 16
 The present action was brought against the Borough, the officers mentioned above, and Chief John Green and Lieutenant John Martin of the West Chester police department. Discovery adduced the following additional facts, largely from depositions of various members of the police department.
 
 
 17
 Ronald Williams had first come into contact with West Chester Police Corporal Wayne Boggs and some members of his platoon on May 21, 1979, when he threatened to jump from the fifth floor of a parking garage while carrying an umbrella. The officers restrained him, and Boggs subsequently filed a petition to commit Ronald involuntarily to a mental institution. Although both Ferriola and Chesko had at one time served in Boggs's platoon, Ferriola for two years in the early 1980's and Chesko for several years in the late 1970s, Ferriola testified that he had no recollection of the incident, and Chesko testified that he remembered only that Boggs had been involved in an incident with someone at the parking garage, but did not know that it was Ronald Williams.
 
 
 18
 Ronald came into contact with the West Chester police again on December 14, 1979, when he drove his car into a wall, attempted to electrocute himself in a bathtub, and then, in the presence of police officers, tried to cut his wrists.
 
 
 19
 Ronald also came into contact with the West Chester police on November 15, 1983, when police officers found him lying in the street attempting to be hit by a car. After having been arrested by an Officer Kubiak, Ronald broke free from physical custody and threatened to jump from a bridge.[7] Although Dispatcher McBride knew of the incident on the bridge and of Williams's general propensity toward self-destructive behavior, there is no direct evidence that Ferriola, Morris or Chesko knew of these incidents.[8]
 
 
 20
 Police Sergeant Thomas Yarnall testified at a deposition that the West Chester police department attempts to enter everything that occurs during any given police shift into a blotter, and that the shift supervisor reads the blotter to incoming police officers before the following shift begins.[9] Yarnall also testified that it was "common knowledge" within the department that Ronald Williams had made some suicide attempts but that, although he hoped that Ferriola and Chesko would have known this, he would not be surprised if they did not. Yarnall Dep. at 69-70. The police department is small, consisting of only 35 employees including civilians. Chief Green himself knew the Williams family and had heard that Ronald had a mental problem, although he denied knowledge of the suicide attempts.
 
 
 21
 After discovery, the defendants moved for summary judgment. Plaintiffs' counsel thereafter filed an affidavit asserting that a genuine issue of material fact existed because plaintiffs would introduce expert testimony to the effect that, based on national minimum standards for jail suicide prevention, the defendants had acted with deliberate indifference to Ronald Williams's serious medical needs.
 
 
 22
 On December 15, 1988, the district court granted summary judgment to all defendants. It concluded that summary judgment was appropriate as to Sergeant Chesko, Officers Ferriola and Morris, and Dispatcher McBride because there was no evidence from which a reasonable jury could find that they had acted with deliberate indifference to the serious psychological needs of Ronald Williams. The district court also concluded that summary judgment was appropriate as to Police Chief Green and Lieutenant Martin because there was no evidence that they had contemporaneous knowledge of the events leading up to Ronald Williams's suicide or knowledge of a prior pattern of similar incidents. Finally, the district court granted summary judgment as to the Borough of West Chester. It reasoned that in light of its grant of summary judgment to all the individual defendants, plaintiffs could not have suffered any constitutional harm. Alternatively, the district court granted summary judgment because it found no genuine dispute as to the fact that Ronald Williams's suicide was not caused by a custom or policy of the Borough. Plaintiffs appeal only the grant of summary judgment to Sergeant Chesko, Officer Ferriola, Dispatcher McBride, and the Borough.
 
 III.
 A.
 
 23
 Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact, and once the moving party has sustained this burden, the opposing party must introduce specific evidence showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 322-24, 106 S.Ct. at 2552-53. The quantum of evidence that makes a factual dispute "genuine" has been discussed in the introduction. Our standard of review is plenary, and we must apply the same test that the district courts should use initially. Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir.1988).
 
 B.
 
 24
 In order to prevail in a section 1983 action, a plaintiff must show that the defendant deprived him of a right or privilege secured by the Constitution or laws of the United States while acting under color of state law. See, e.g., Riley v. Jeffes, 777 F.2d 143, 145 (3d Cir.1985). Custodial officials may be liable in damages for the suicide of a pretrial detainee if they acted with "deliberate indifference" to the individual's psychological needs. Colburn v. Upper Darby Township, 838 F.2d 663, 669 (3d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); Freedman v. City of Allentown, 853 F.2d 1111, 1115 (3d Cir.1988).[10]
 
 
 25
 In Colburn, plaintiff Sue Ann Colburn, administratrix of the estate of Melinda Lee Stierheim, filed a section 1983 action against Upper Darby Policewoman Diane Miller and others. The following facts were either alleged in the complaint or would have been alleged in an amended complaint had leave to amend been granted. Stierheim was taken into custody by the Upper Darby police department, which was familiar with her because of her relationship with members of the "Warlocks" motorcycle gang. On the day before she was taken into custody, the police had been called to her apartment after she had jumped from a window following an argument with her boyfriend. Stierheim had "obvious scars" on her right wrist from a previous suicide attempt. Before placing Stierheim in a jail cell, Miller, the police matron on duty at the time, searched her. Miller found a live round of ammunition in Stierheim's pocket, but, even though Stierheim was wearing only shorts and a halter top, did not find the handgun with which Stierheim later shot and killed herself. Miller also had to prevent Stierheim from swallowing three valium pills Stierheim had removed from her purse. The district court granted Miller's motion to dismiss, and we reversed, concluding that these facts, if proved, could establish that Miller knew or should have known of Stierheim's vulnerability to suicide and that she acted with deliberate indifference thereto.
 
 
 26
 In Freedman, plaintiff Albert Freedman, administrator of the estate of Jerry Freedman, filed a section 1983 action against probation officer Frank Kroboth, Allentown police officers George LaFaver and Robert Hendricks, and Allentown police detective Carl Balliet. Jerry Freedman had committed suicide after having been questioned and arrested by Detective Balliet. The complaint alleged that the defendants should have known of Freedman's suicidal propensity and that they acted with reckless indifference by not taking steps to prevent Freedman's suicide. This contention was based on the allegation that during his questioning by Detective Balliet, Freedman, when asked if he had any scars, had rolled up his sleeve and revealed "large prominent scars" on his wrists, the inside of his elbows, and his neck, which the forensic pathologist later described as "suicide hesitation cuts." Plaintiff also alleged that Probation Officer Kroboth knew of Freedman's suicidal tendencies but did not inform Detective Balliet of them during a telephone conversation.
 
 
 27
 The district court granted the defendants' motion to dismiss, and we affirmed. We concluded that the allegations regarding the officers' knowledge of Freedman's suicidal propensity were factually unsupported and that their failure to recognize Freedman's scars as attempted suicide marks and to take appropriate action at most constituted negligence and could not support a finding of deliberate indifference. We concluded that Kroboth's failure to warn Balliet of Freedman's suicidal tendencies was also, at most, negligent. We distinguished Colburn by noting that the cumulative evidence of the decedent's suicidal propensity was much greater in that case. See 853 F.2d at 1116. We noted that we must engage in line-drawing, and concluded that the facts in Colburn fell on one side of the line and the facts in Freedman on the other. See id. at 1117-18.
 
 IV.
 A.
 
 28
 Turning to the application of the foregoing principles to the present case, I begin by considering the district court's grant of summary judgment to Officer Ferriola and Sergeant Chesko. I note initially that there is no direct evidence that either Ferriola or Chesko actually knew of Ronald Williams's suicidal propensity. Sergeant Yarnall testified at his deposition that he would not be surprised if neither Ferriola nor Chesko knew about it. Both Ferriola and Chesko testified that they did not know of it. Although both Ferriola and Chesko had served in Corporal Boggs's platoon and although Boggs had first-hand knowledge of Williams's suicidal tendencies, see supra at 462, there is no evidence that either Ferriola or Chesko was present at the time of the attempted suicides. Nor is there direct evidence that they were ever told about these incidents.[11]
 
 
 29
 On the other hand, Yarnall testified in his deposition that Williams's suicidal tendencies were widely known in the West Chester police department.[12] Moreover, the department, at all times relevant to this case, consisted of only 35 people, including civilians. Ferriola and Chesko served on a squad that recorded the utterly bizarre behavior of Ronald Williams on a police blotter read at succeeding shifts. The question is whether, given the propensity of human beings to talk about bizarre behavior, a reasonable jury could find that Ferriola and Chesko knew about Williams's suicidal tendency and whether, if they knew, the jury could find that they acted with deliberate indifference to Ronald's psychological condition by not following what some evidence in the record (which the jury could credit) suggests to be the normal policy regarding belt removal.
 
 
 30
 The case is extremely close, but I conclude that no reasonable jury could so find. Ferriola and Chesko both swore to affidavits stating that they knew nothing of Ronald's past history, and no direct evidence in the record contradicts their testimony. Moreover, the circumstantial evidence mentioned above, which at first glance seems not insignificant, becomes quite tenuous when viewed in a broader context. A thirty-five member force is small, but not tiny. West Chester has a population of approximately 18,000 people. Aberrant behavior presumably is reported to the police on a regular basis. Ronald's two most bizarre suicide attempts occurred six years before Ferriola and Chesko arrested him. This evidence, I believe, would not support a finding that either Ferriola or Chesko knew of Ronald's prior history. Without such knowledge, their failure to remove his belt constitutes at most negligence.
 
 
 31
 Although the line we draw today is, as I have said, not easy to place, the line must be drawn somewhere, and somewhere that adequately protects the salutary policies underlying Rule 56. Of course the right to present one's claims to a jury provides competing, no less important policies to be considered, but the upshot of the Supreme Court's summary judgment trilogy is that the former must not be sacrificed entirely to the latter.[13] The old scintilla rule, although it would make cases like this one far easier to decide, did just that. I concede, as I must, that plaintiffs have adduced some circumstantial evidence tending to show deliberate indifference. However, because the line we must draw depends entirely on context, and differences in degree, "some" evidence is not necessarily enough to survive summary judgment.
 
 
 32
 I conclude that this case falls on the side of the line where some evidence is not enough. Perhaps, if either the town or the police force had been smaller, or if the bizarre incidents had occurred more recently, or if plaintiffs had been able to develop more evidence, see supra note 11, this case might fall on the other side of that line. We will affirm the grant of summary judgment as to Ferriola and Chesko.
 
 B.
 
 33
 The case against Dispatcher McBride is simpler, even though McBride admitted that he knew of Ronald's past suicide attempts. Uncontroverted record evidence indicates that dispatchers have no responsibility for the care of prisoners. Moreover, it appears that McBride could not easily see the cell where Ronald was being held from his desk. Under these circumstances, no reasonable jury could find that his conduct meets the standard of deliberate indifference set out in Freedman and Colburn. Accordingly, we will also affirm the grant of summary judgment as to McBride.
 
 C.
 
 34
 A municipality may be liable under section 1983 only if it can be shown that its employees violated a plaintiff's civil rights as a result of a municipal policy or practice. See Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). West Chester cannot be vicariously liable under Monell unless one of West Chester's employees is primarily liable under section 1983 itself. "If a person has suffered no constitutional injury at the hands of [any] individual police officer, the fact that the departmental regulations might have authorized [unconstitutional action] is quite beside the point." City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806(1986) (per curiam) (emphasis in original). Because Judge Garth and I have determined that the plaintiffs have no viable claim against any individual officer, they cannot have a Monell claim against West Chester.[14]
 
 
 35
 The judgment of the district court will be affirmed.
 
 
 36
 GARTH, Circuit Judge, concurring in the judgment of the Court:
 
 
 37
 I concur in affirming the district court's judgment. I write separately as to officers Ferriola and Chesko only in order to emphasize that the record in this case reveals no material dispute of fact which could lead to a denial of summary judgment as to them, and to express some slight, but significant, differences that I have with Judge Becker's summary judgment analysis--differences which, however, do not change the result in this case.
 
 
 38
 To defeat a motion for summary judgment, competent evidence must be produced, either through depositions, affidavits, or other sworn statements which reveal a material dispute of fact that can only be resolved by a trier of fact at a trial. On the other hand, where the movant correctly states the law and the opposing affidavits submitted in opposition to a summary judgment motion are not made on personal knowledge or do not set forth facts as would be admissible in evidence (see F.R.C.P. 56(e)) or do not reveal a material dispute of fact, the district court judge, in accordance with Federal Rule of Civil Procedure 56, must grant summary judgment to the movant. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 
 39
 In such an instance, the court cannot avoid its responsibility to grant or to affirm summary judgment because it hypothesizes "what might have been established" or "what possibly could be established" at a trial. The die is cast when the parties join issue on the summary judgment motion, each relying on the sworn proofs that each has been able to assemble or produce at that time. And, if additional proofs are deemed necessary by the party opposing the motion (here the Estate of Ronald Williams) time for additional discovery may always be sought and ordered pursuant to F.R.Civ.P. 56(e).
 
 
 40
 In accordance with these principles, when we review a grant of summary judgment, it is not our function to determine what "reasonable jurors could conclude." (Becker, J., Op. p. 460) Rather, our function is the threshold function of determining whether the record presents a material dispute of fact whose resolution requires a trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1985). Only when the record reveals such a dispute, does the role of the jury come into play.
 
 
 41
 Accordingly, I cannot agree with Judge Becker's reading of Liberty Lobby or his analysis of the jury's role in summary judgment proceedings (Becker, J., Op. p. 460). While Liberty Lobby, supra at 248, 106 S.Ct. at 2510, does state that the district court must ask itself "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," that question is only asked and is only relevant once a material issue of fact in dispute has been identified. One need only ask what there would be for a reasonable jury to determine, if no material dispute of fact is present in the first instance? As the Supreme Court stated in Liberty Lobby:
 
 
 42
 Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." And, as we noted above, Rule 56(c) provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. There is no requirement that the trial judge make findings of fact. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. (emphasis added) (footnotes omitted)
 
 
 43
 Liberty Lobby, 477 U.S. at 250, 106 S.Ct. at 2511.
 
 
 44
 Thus, the denial of summary judgment requires a two step process. The district court must first determine that a dispute of fact is present. Then, and only then, is the evidence evaluated to determine if the factual dispute is one of such magnitude and significance that a reasonable jury could return a verdict for the nonmoving party. Absent a factual dispute, the question of what a "reasonable" jury can or cannot decide is never reached.
 
 
 45
 In determining whether a summary judgment motion should be granted by the trial court or affirmed by an appellate court, it therefore becomes important to examine the record for the existence of any genuine issues of material fact bearing on whether Ferriola or Chesko were deliberately indifferent to Ronald's welfare.
 
 I.
 A.
 
 46
 Ferriola's and Chesko's Knowledge of Ronald's Suicidal Tendencies
 
 Ferriola
 
 47
 The record reveals that in May 1979 Ronald attempted suicide by jumping from the fifth floor of a parking garage. The record however, reveals that neither Ferriola nor Chesko had any knowledge of that incident. Although Ferriola admitted that at one time he had been in Corporal Boggs' squad (from about 1980 to 1982) he unequivocally denied any knowledge of Ronald's suicide attempt (F.Dep. p. 8) Ferriola also denied knowledge of later attempts by Ronald to set himself aflame or to commit suicide by lying in the road in the face of an oncoming vehicle (F.Dep. p. 9). He stated without contradiction that he had no knowledge of Ronald's mental health history (F.Dep. p. 11) and that he knew of no actions taken by Ronald where he "ever endangered [himself] or others." (F.Dep. p. 13). Nor did he recall any problems when he placed Ronald in the prison cell on the day of his arrest (F.Dep. p. 22).
 
 Chesko
 
 48
 Sergeant Chesko also denied any knowledge of Ronald's infirmities. Thus, when Chesko was asked:
 
 
 49
 Q: "Did you have any experience with Ronald Williams attempting or threatening suicide?"
 
 
 50
 A: "Not to my knowledge." (C.Dep. p. 20-21).
 
 
 51
 Chesko repeatedly denied that he had any information as to Ronald's mental health problems stating:
 
 
 52
 Q: "You had no information that indicated for example, that he had been committed?"
 
 
 53
 A: "No." Id.
 
 
 54
 On page 23 of his deposition, Chesko was asked:
 
 
 55
 Q: "Is it your testimony that you had no prior information as of April 18, 1985 [the date of Ronald's arrest giving rise to the instant action] that indicated to you that Ronald Williams had any mental health problems?"
 
 
 56
 A: "I had no knowledge of that."
 
 
 57
 He also denied knowledge of each of the specific incidents of attempted suicide (C.Dep. p. 24, 25).
 
 
 58
 Q: "Do you recall an incident in 1979 where Ronald Williams threatened to commit suicide by jumping off the fifth floor of the parking garage?"
 
 
 59
 A: "No."
 
 
 60
 Q: "Do you recall an incident where Mr. Williams was talked off the parking garage by Officer Boggs who then filed a mental health treatment petition to get Ronald emergency treatment?"
 
 
 61
 A: "I don't recall that. No."
 
 
 62
 Q: "Had you ever heard about that?"
 
 
 63
 A: "I don't remember it being specifically him involved. I do remember Boggs being involved in an incident with somebody at the parking garage, but I didn't remember who it was until you mentioned it now."
 
 
 64
 Q: "Do you remember being there?"
 
 
 65
 A: "No." Id.
 
 B.
 The Police Blotter System
 
 66
 Sergeant Chesko discussed the police blotter in his deposition on pages 55 through 57. The entire purport of his testimony, together with the testimony of others,[1] particularly Sergeant Yarnall, may be summarized as follows: the West Chester Police Department attempts to enter everything that occurs on the previous police shift onto a police blotter. As Judge Becker has pointed out, (Becker, J., Op. p. 16) the shift supervisor reads the blotter to incoming police officers before the following shift begins. (Y.Dep. p. 94, 95). The blotter is read only to transmit knowledge from one shift to the next shift, and not to all police officers and succeeding shifts. Id.
 
 Chesko testified:
 
 67
 Q: If there is somebody committed for suicidal behavior by the first platoon or on more than one occasion, is there any policy or procedure that would make sure that that information would get to the fourth platoon?
 
 
 68
 A: No. Generally, a lot of that information is placed in the police blotter, but that is the only way I really have any knowledge of it.
 
 
 69
 Q: Would you agree, assuming, and I will ask you to assume for a second, that Corporal Boggs had Mr. Williams committed for suicide back in 1979 and Officer Capik had it done in 1983 for suicidal behavior and Ronald told both of them and others that he was going to continue to attempt suicide. Is there any reason why that information never got to you, any reason that you know of?
 
 
 70
 A: No, other than I may have been off on vacation, not seen it in the blotter, if indeed it was in the blotter. I may have known of an incident. Take the Boggs situation with him at the parking garage. I may have known of the incident and not particularly known of the names.
 
 
 71
 Q: Would it be part of the policy or procedure if there was one? Do you believe that there was any policy or procedure that would assure that that information got to the right people, prior suicidal behavior requiring emergency mental health treatment?
 
 
 72
 A: ... No, there is no way of insuring that that happens. (C.Dep. p. 55-56).
 
 
 73
 Sergeant Chesko continued this theme on pages 58 and 59 of his deposition. He was asked:
 
 
 74
 Q: If for example you were to refer somebody for a mental health problem today, would that be entered on the blotter?
 
 
 75
 A: Most likely.
 
 
 76
 Q: Now, you were asked to assume that Officer Capik referred the deceased for a mental health evaluation in 1983, correct?
 
 
 77
 A: Correct.
 
 
 78
 Q: Now, assume that that was entered on the blotter at that time. Would there be any reasons for you to have gone back and reviewed entries on the blotter that are a year or so prior to the date of the incident in question?
 
 
 79
 A: No.
 
 
 80
 Q: Would there be any reasons for you to assume that if Mr. Williams had been suicidal at the time Officer Capik made references to mental health that he would be necessarily suicidal when you saw him sometime later?
 
 
 81
 A: No. (C.Dep. p. 58, 59).
 
 
 82
 Sergeant Yarnall confirmed each detail of Ferriola's and Chesko's testimony, testifying that neither of them would necessarily know of Ronald's mental health problems. When asked if everybody should have had knowledge of Ronald's suicidal tendencies, Yarnall replied "The best way for me to answer that is, I would hope that all knew it, but it would not be uncommon that they did not know it." (Y.Dep. p. 70). He further testified:
 
 
 83
 Q: Would it surprise you to learn that Sergeant Chesko testified that he had no knowledge of Ronald's prior mental health problems, commitment, or treatment?
 
 
 84
 A: That wouldn't.
 
 
 85
 Yarnall's testimony to the effect that it was common knowledge through people in the police department that Ronald had tried to kill himself before April 1985, is the only testimony that even comes arguably close to constituting a material dispute of fact. However, it falls far short of meeting that burden.
 
 
 86
 The flaw in Sergeant Yarnall's testimony was that the record reveals no basis or foundation was given for his observation of "common knowledge." They are mere "beliefs" which cannot be used to resist a summary judgment motion. Facts made of personal knowledge are admissible. Beliefs, no matter how sincere, are not. As a panel of this court, which included Judge Becker, said in Hinkla v. Bethlehem Steel Corp., 863 F.2d 279, 281-82 (3d Cir.1988):
 
 
 87
 This court in Maldonado v. Ramirez, 757 F.2d 48, 50 (3d Cir.1985), indicated that Federal Rule of Civil Procedure 56(e) requires that an affidavit in opposition to a motion for summary judgment must be based "on personal knowledge," must establish "such facts which would be admissible" and must "show affirmatively that the affiant is competent to testify in all matters stated therein." The quoted assertions by [plaintiff] fail any of the criteria set forth in Rule 56(e). Satisfaction of the first criteria fails because [plaintiff] did not establish that his affidavit was based on personal knowledge. He merely used the word "believe." ... Furthermore, many of the statements within the affidavit were hearsay and would be inadmissible unless they qualified as hearsay exceptions. Because the affidavit did not meet the requirements of Rule 56(e), it may not be considered in deciding defendants' motion for summary judgment. (emphasis added)It must be remembered that Sergeant Yarnall's testimony, which I reproduce below, is not that Ferriola told him, Yarnall, that he [Ferriola] knew of Ronald's suicidal tendencies or that Ferriola was present at any time when these matters were discussed. Rather, Sergeant Yarnall's "common knowledge" testimony is devoid of any hint of its source and similarly devoid of any foundation in fact. Of even more importance, Yarnall was never asked to identify and never did identify Ferriola and Chesko as officers with this "common knowledge." Yarnall did no more than state that "I [Yarnall] knew that Ronald had done some crazy things ..." (Y.Dep. p. 70).
 
 
 88
 Thus, I differ somewhat from Judge Becker's analysis which apparently would give evidentiary effect to Yarnall's speculation (Becker, J., Op. fn. 12), although Judge Becker agrees that even if Yarnall's testimony is considered, summary judgment for the officers must nevertheless be affirmed.
 
 The testimony of Yarnall was:
 
 89
 Q: Do you recall ever hearing of an incident where Officer Kubiak petitioned for Ronald's commitment after he wandered in and among traffic on Gay Street for the avowed purpose of being hit and killed by a car; after arrested threatened to jump from the bridge on Gay Street in an attempt to kill himself?
 
 
 90
 A: I seem to recall that, that Ronald did something. I don't recall specifics, and I was not involved in it.
 
 
 91
 Q: Did you have any information at any time before April of 1985 that Ronald had tried to kill or threatened to kill himself?
 
 
 92
 A: Well, I think Ronald had made--I think it was common knowledge he had made some attempts.
 
 
 93
 Q: Common knowledge among whom?
 
 
 94
 A: Through people in the police department I would say.
 
 
 95
 Q: Would you expect that all platoons would have known about that?
 
 
 96
 A: The best way for me to answer that is I would hope they all knew it, but it would not be uncommon that they didn't know it.
 
 
 97
 (Y.Dep. p. 69, 70).
 
 
 98
 In my opinion, as I have stated, that testimony is incompetent without a proper foundation, see Hinkla v. Bethlehem Steel Corp., 863 F.2d 279, 281-83 (3d Cir.1988). Maiorana v. MacDonald, 596 F.2d 1072 (1st Cir.1979), Beyene v. Coleman Security Services, 854 F.2d 1179 (9th Cir.1988) ("The remaining evidence submitted in support of [plaintiff's] summary judgment motion is inadmissible; it lacks foundation and is hearsay"). Only evidence admissible at trial may be used to test a summary judgment motion. Thus evidence whose foundation is deficient must be excluded from consideration. Beyene v. Coleman Security Services, supra; Washington v. Armstrong World Industries, Inc., 839 F.2d 1121 (5th Cir.1987); Viterbo v. Dow Chemical Co., 826 F.2d 420 (5th Cir.1987); Hamilton v. Keystone Tankship Corp., 539 F.2d 684 (9th Cir.1976). Again, Judge Becker has previously acknowledged this principle when he was a district court judge in Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 505 F.Supp. 1125, 1139 (W.D.Pa.1980). ("[I]n ruling upon summary judgment motions, courts refuse to consider ... documents without a proper foundation.")
 
 
 99
 Hence, under any view, Yarnall's "common knowledge" testimony cannot be considered as contradicting the officers' statements that they had no knowledge of Ronald's tendencies. See Freedman v. City of Allentown, Pa., 853 F.2d 1111 (3d Cir.1988) (requiring knowledge by defendant officers of suicidal tendencies and identification of particular officers). Even if competent, which it is not, the "common knowledge" of officers in a police department could not satisfy the requirement for the specific identity of officers required in civil rights cases. Freedman at 1114.
 
 
 100
 Thus, there is no issue of Ferriola's or Chesko's knowledge that could go to a jury because it is undisputed that neither of them had knowledge of Ronald's suicidal tendencies. Neither of them was present at any time that Ronald attempted suicide. Neither of them was on a squad which recorded Ronald's behavior on a police blotter. Neither of them was present on a shift at which the police blotter containing such information ever was read, and indeed, no evidence of the police blotter containing such information appears on the record of this proceeding.
 
 
 101
 As Judge Becker notes in his footnote 11, some of these evidentiary deficiencies perhaps could have been cured by more thorough depositions. However, that cannot change the summary judgment result rendered by the district court in this case. If neither Ferriola nor Chesko was part of Boggs' squad and if neither of them read the police log, or had it read to them, and if neither of them was identified as being members of the squad that recorded Ronald's behavior on a police blotter, and they had no knowledge of Ronald's suicidal tendencies, no deliberate indifference to Ronald's welfare can be implied or inferred.
 
 C.
 Deliberate Indifference
 
 102
 Ferriola as well unhesitatingly asserted that there was no standing order that required the removal of a belt from a prisoner before the prisoner was incarcerated (F.Dep. p. 26). He claimed that he had no responsibility to remove Ronald's belt stating "[A]s a result of my investigation after the incident, to the best of my knowledge, there is no standing order that specifically states that a belt will be taken prior to placing someone into the cell block." (F.Dep. p. 25) Ferriola further testified that he understood the belt policy to be that it was strictly up to him as to whether he took a prisoner's belt or not, when he placed a prisoner in the cell. (F.Dep. p. 44)
 
 
 103
 This was likewise the testimony of Lieutenant John Martin of the West Chester police force. When asked at deposition:
 
 
 104
 Q: Do you have a policy with regard to what should be taken from prisoners before he or she is placed in the cell block area?
 
 
 105
 A: Generally, everything that they own, everything they had with them.
 
 
 106
 Q: Belts and shoe laces?
 
 
 107
 A: No.
 
 
 108
 * * *
 
 
 109
 * * *
 
 
 110
 Q: Are belts to be taken from prisoners?
 
 
 111
 A: That's not policy, sir, but it's ordinarily.
 
 
 112
 Q: It's not enacted in any policy?
 
 
 113
 A: That's correct, sir. (Martin Dep. p. 43-44)
 
 
 114
 Police Chief Green, at his deposition did not contradict this. He was asked:
 
 
 115
 Q: Are there rules and regulations adopted by the Borough on securing prisoners?
 
 
 116
 A: There is one in the book on prisoners, yes.
 
 
 117
 Q: Does it say anything about, for instance, belts?
 
 
 118
 A: It's about a two page thing. I'm not going to sit here and say yes or no. It possibly could. (Green Dep. p. 66)
 
 
 119
 Even had there been a prison policy of removing a prisoner's belt, an issue as to which there is substantial question, in the absence of knowledge on the part of Ferriola and Chesko, the failure to remove Ronald's belt could not in the instant setting constitute "deliberate indifference." The most that could be said was that whoever had responsibility for the removal of Ronald's belt may well have been negligent, but mere negligence is insufficient to maintain a § 1983 action. Freedman v. City of Allentown, Pa., supra; Colburn v. Upper Darby Tp., 838 F.2d 663 (3d Cir.1988).
 
 
 120
 We said in Colburn at 838 F.2d 668, referring to Davidson v. O'Lone, 752 F.2d 817 (3d Cir.1984) (in banc), aff'd sub nom. Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986):
 
 
 121
 ...liability may be imposed on prison officials, even for assaults which they did not commit, 'if there was intentional conduct, deliberate or reckless indifference to the prisoner's safety, or callous disregard on the part of prison officials.' Id. at 828. We reaffirmed that where prison officials infringed a liberty interest by intentional conduct, gross negligence, or reckless indifference, or an established state procedure, the matter is actionable under § 1983.
 
 
 122
 Here, of course, the record reveals no established state procedure any more than it reveals knowledgeable conduct, intentional conduct, deliberate indifference, or reckless indifference. Of particular interest is the fact that no evidence was ever produced by Ronald Williams' estate to contradict or dispute the testimony of Ferriola, Chesko, or McBride insofar as that testimony pertained to the "deliberate indifference" standard or to the procedure for handling prisoners and removing their personal belongings.
 
 II.
 Third Circuit Precedent
 
 123
 I add just a few words about this court's opinions in this area. Both Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir.1988) and Freedman v. City of Allentown, Pa., 853 F.2d 1111 (3d Cir.1988) involved jailhouse suicides, as does the instant case. Judge Becker has summarized the facts in both cases (Becker J., Op. p. 464-65). I call attention to only one or two matters emphasized in Freedman because of their bearing in the instant case.
 
 
 124
 Significantly, Freedman, as well as its predecessor Colburn, both came to us not as judgments rendered in summary judgment proceedings, but rather from judgments which dismissed their respective complaints under F.R.C.P. 12(b)(6). In Colburn, we reversed the district court's order of dismissal and held that, taking all the well-pleaded allegations as true and construing the complaint in the light most favorable to the plaintiff, the complaint stated a sufficient § 1983 cause of action. Because there had been no discovery establishing the facts alleged in the Colburn complaint, we reversed for further development of the record.
 
 
 125
 In Freedman, we affirmed the dismissal of a § 1983 complaint. Freedman's estate had filed a complaint against police defendants and the City of Allentown because Freedman had committed suicide while in prison. It is significant for our purposes here that the complaint in Freedman charged that the defendants "knew or should have known" of Freedman's "suicidal tendency and attempts" and "knew or should have known" that Freedman "posed a significant and substantial risk of suicide ... if left unaided or in possession of items with which he could take his own life." Freedman, 853 F.2d at 1113.
 
 
 126
 During Freedman's questioning, there were revealed to the questioning officers prominent scars on Freedman's elbow and neck, characterized as "suicide hesitation cuts," and Freedman, it was alleged, had attempted suicide at least one time prior to his actual suicide in jail. The district court in Freedman dismissed Freedman's complaint because it found nothing more than mere negligence on the part of the individual officers and because there were no facts asserted which supported the allegation that the policemen knew or should have known of Freedman's suicidal tendencies.
 
 
 127
 In Freedman we held that a prison custodian is not the guarantor of a prisoner's safety and that "we cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to safeguard the safety of prisoners entrusted to their care." Freedman, 853 at 1115. Freedman further instructed that prison officials must actually know of the suicidal tendencies of a prisoner and must have ignored their responsibility to take reasonable precautions in the light of that knowledge. Moreover, Freedman holds, as Judge Becker has reported, (Becker J., Op. p. 465) that even if a prison official should have known and identified Freedman's scars as "suicide hesitation cuts" the failure to recognize them as such, without more, amounted only to negligence and therefore failed to support a claim under § 1983.
 
 
 128
 If Freedman, in accordance with rule 12(b)(6) principles, did not state a claim under § 1983, then a fortiori, in the present case where evidence has been taken and that evidence has been uncontradicted and undisputed, summary judgment for the officers must be affirmed. Accepting Freedman's instructions, it would appear that even had Ferriola and Chesko known of Ronald's prior suicide attempts, which they unequivocally denied, that knowledge can be deemed no more than the knowledge which the Freedman defendants had of Freedman's "suicide hesitation cuts" and as such, could not allow a constitutional claim for damages. Freedman therefore compels summary judgment in favor of the police officers in a case such as the present one, where the record does not demonstrate knowledge and "deliberate indifference" on their part.
 
 
 129
 I therefore respectfully concur in the result Judge Becker has announced as the judgment of the court.
 
 
 130
 STAPLETON, Circuit Judge, concurring and dissenting:
 
 
 131
 The opinion announcing the judgment of the court describes the summary judgment record in an accurate and evenhanded manner. I concur in Section IA of that opinion and with most of what is said thereafter including the analysis set forth in footnote 12. I respectfully dissent only from the court's ultimate conclusion with respect to Ferriola and Chesko. I believe reasonable jurors could conclude on the basis of the circumstantial evidence and their knowledge of human nature that Ferriola and Chesko probably (i.e., more likely than not) had heard of Ronald's bizarre behavior.
 
 
 
 [1]
 Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)
 
 
 [2]
 Cf. also Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356 ("It follows from these settled principles that if the factual context renders [the nonmoving parties'] claim implausible ... [they] must come forward with more persuasive evidence to support their claim than would otherwise be necessary."); id. at 593, 106 S.Ct. at 1359 ("[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible...."). Matsushita's principles arguably apply only to summary judgment motions in antitrust cases. At the very least, however, this language reinforces the point made more generally in Liberty Lobby
 
 
 [3]
 In light of this jurisprudence, I cannot accept Judge Garth's assertion that "when we review a grant of summary judgment, it is not our function to determine what 'reasonable jurors could conclude.' " Post at 468. Judge Garth correctly asserts that "our function is the threshold function of determining whether the record presents a material dispute of fact whose resolution requires a trial." Id. The dispute of material fact must be "genuine," however, see Fed.R.Civ.P. 56(c), and Liberty Lobby held that asserted disputes of material fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248, 106 S.Ct. at 2510. Judge Garth proposes a two-step inquiry under which a court would ask first, whether a dispute of material fact is present, and second, whether that dispute is genuine. See post at 468. Because these questions are so similar (if not identical), I do not understand Judge Garth's intuition for keeping them analytically distinct. In any event, whatever the content of Judge Garth's threshold inquiry, it would seem to add nothing to the summary judgment test as a whole because presumably any asserted dispute of material fact found not to be "present" at the first stage would also be found not to be "genuine" at the second stage
 
 
 [4]
 Richard Williams's claims are based upon the fact that he was in the cell next to Ronald's when Ronald committed suicide and as such was compelled to witness the act
 
 
 [5]
 Police Chief John Green testified that belt removal was required. However, the regulation was unwritten, and Ferriola testified that it was not a firm rule
 
 
 [6]
 Sergeant Thomas Yarnall testified that it would not be appropriate for McBride to check on the prisoners. He stated:
 If the dispatcher gets up every time he hears a noise he is never going to be there to answer the radio and phone, and because those guys back there start yelling they want a cigarette, they want to make a phone call, they want their lawyers, they want their Miranda rights. You would be running back and forth all day. You might once every half hour. Sometimes if you are busy, you can't get to it exactly on the half hour or whatever it is.
 Yarnall Dep. at 85.
 
 
 [7]
 Apparently Ronald had taken some rat poison before this incident. There was also evidence that on November 12, 1981, he attempted to set himself on fire and that in January 1983 he was admitted to the Chester County Hospital Emergency Room for taking 60 Valium pills and cutting his left wrist. However, there is no evidence that the police knew of these occurrences
 
 
 [8]
 At their depositions Ferriola and Chesko repeatedly denied knowledge of Ronald's mental health problems
 
 
 [9]
 The blotter is not read to all police officers or to succeeding shifts, and officers generally do not review blotter entries for previous dates. If an officer is absent from a shift, obviously he does not hear what is in the blotter. Moreover, Chesko testified that he might have heard of an incident from a blotter entry, but that he did not remember the name involved
 
 
 [10]
 In Colburn, we concluded that police officers are obligated under the Fourteenth Amendment not to act with "reckless indifference." See 838 F.2d at 669. However, we have not attempted to draw distinctions among terms like "reckless indifference," "deliberate indifference," "gross negligence," or "reckless disregard" in this context. See id. at 670. We decline to do so in this opinion and will, therefore, use the term "deliberate indifference" to refer to the type of conduct or state of mind described by these terms collectively
 
 
 [11]
 Plaintiff's counsel pursued this case with great diligence. However, he was unable to produce evidence as to the personnel makeup of Boggs's squad in 1979, to produce the police logs, which might have reflected Ronald's earlier suicide attempts, to produce the rosters of officers present on the day after any of Ronald's suicide attempts, or to develop from other officers whether Ferriola or Chesko had participated in the investigations of the suicide attempts or whether they were present at police shifts when the logs were read
 
 
 [12]
 Judge Garth contends that Yarnall's testimony "is incompetent without a proper foundation," Post at 471, and therefore may not be considered at all. This contention requires an extended response
 The relevance of this evidence, of course, does not depend upon any condition of fact (which would have to be supported by foundation evidence, see Fed.R.Evid. 104(b)): if believed, Yarnall's testimony that many officers knew about Ronald's history increases the probability that Ferriola and Chesko knew; thus, it clearly passes the low threshold of relevancy imposed by Fed.R.Evid. 401. Judge Garth is correct that Yarnall's testimony does not "contradict[ ]" Ferriola's and Chesko's direct testimony. Post at 471. However, evidence otherwise admissible has never been thought to be inadmissible in light of more powerful countervailing evidence, and circumstantial evidence has never been thought incompetent to undermine direct testimony with which it is not necessarily incompatible. If the evidence is so one-sided that no reasonable jury could find deliberate indifference, then Ferriola and Chesko are entitled to summary judgment. However, this does not imply that Yarnall's testimony cannot be considered in determining just how one-sided the evidence is.
 Judge Garth is more likely suggesting that Yarnall's testimony is unsupported by foundation evidence that Yarnall had "personal knowledge" about the content of his testimony. See Fed.R.Evid. 602; Post at 470. "Evidence to prove personal knowledge may ... consist of the witness' own testimony." Fed.R.Evid. 602. When asked to clarify his statement that "it was common knowledge [that Ronald] had made some [suicide] attempts," Yarnall, who had already testified that his only direct involvement with Ronald involved a different incident several years ago, responded, "I knew that Ronald had done some crazy things, put it that way." Yarnall Dep. at 70. In this context, one can fairly infer that Yarnall learned about Ronald's suicidal tendency from hearing it discussed around the squad room. Thus, Yarnall's testimony establishes that he did have personal knowledge of other officers' familiarity with Ronald's past.
 Finally, Judge Garth might be suggesting that Yarnall's testimony cannot be considered because it is hearsay. See post at 470-71. First of all, Yarnall's testimony is not hearsay. The out-of-court statements heard by Yarnall to the effect that "Ronald had done some crazy things" are not offered to prove the truth of that proposition, which is undisputed. Instead, they are offered to prove only that Ferriola and Chesko had likely heard similar stories themselves. See Fed.R.Evid. 801(c). Moreover, even if Yarnall's testimony were hearsay, that fact alone would not preclude our considering it. It is true that what is produced at the summary judgment stage must set forth evidence "as would be admissible" at trial, Fed.R.Civ.P. 56(e), and thus must be "reduc[ible] to admissible evidence." Celotex, 477 U.S. at 327, 106 S.Ct. at 2555. However, the Supreme Court has rejected the view that "the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324, 106 S.Ct. at 2553. "Obviously, Rule 56 does not require the nonmoving party to depose [his] own witnesses." Id. Thus, hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e. "in a form that would be admissible at trial."
 
 
 [13]
 Cf., e.g., Celotex, 477 U.S. at 327, 106 S.Ct. at 2555 ("Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.")
 
 
 [14]
 Plaintiffs alleged in their complaint that the Borough had violated Ronald's constitutional rights by (1) failing to require that detainees' belts be removed or to install equipment for visual surveillance of the cell block area; (2) failing to appropriate funds for handling detainees with mental health problems; and (3) failing to train officers in handling detainees with mental health problems. A municipality may be liable only if it acted with deliberate indifference to the consequences of a policy that caused plaintiffs' harm. See City of Canton v. Harris, --- U.S. ----, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989). Even if some individual officers might have been held liable in this case (thus making summary judgment under Heller inappropriate), the record would compel a conclusion that plaintiffs' allegations against the Borough, if true, amount at most to negligence, not to deliberate indifference. Similar claims against a municipality alleging failure to maintain visual surveillance of detainees and to train police officers appropriately were rejected in both Freedman and Colburn. See 853 F.2d at 1116-17; 838 F.3d at 672-73
 
 
 [1]
 The deposition of William Morris, a police officer on the West Chester police department confirmed Yarnall's statements about the blotter. Specifically, Morris confirmed that the blotter system had never informed him of Ronald Williams' mental health problems. (Morris Dep. p. 106-107)