**GREEN CONSTRUCTION COMPANY, Plaintiff,**

v.

**FIRST INDEMNITY OF AMERICA IN-SURANCE COMPANY, De-fendant/Third Party Plaintiff,**

v.

**E.S.C. STONE PRODUCTS, INC. and John Gilham, Third Party Defendants.**

**Civ. A. No. 89–774 (HAA).**

United States District Court,
D. New Jersey.

April 25, 1990.

Klein Chapman, Leonard A. Peduto, Jr., Catherine E. Brown, Clifton, N.J., for plaintiff.

Thomas J. Clarke, Montclair, N.J., for defendant/third party plaintiff.

HAROLD A. ACKERMAN, District Judge.

On February 23, 1989, the buyer, Green Construction Co. ("Green") brought this action lying in diversity against, the surety, First Indemnity of America Insurance Co. ("FIA"). On November 30, 1989, Green filed an amended complaint against FIA, charging that FIA breached its obligation to pay Green the penal sum of a performance bond upon the occasion of the default of the seller, ESC Stone Products, Inc. ("ESC"), (Count One) and that FIA acted in bad faith in the handling and disposition of Green's claim under the bond (Count Two).[1] Green has now moved for summary judgment with respect to the first count of the amended complaint. In turn, FIA has moved for summary judgment on the whole amended complaint. I am prepared to decide these applications now.

## BACKGROUND

Green entered a general contract with the New Jersey Department of Transportation to construct sections of Route 287 and Route 23 (*see* exh. B attached to the Plaintiff's Brief in Support). To aid it in the completion of this general contract, Green entered into a materials purchase contract with ESC Stone Products (id.). That contract provided that ESC was to deliver to Green, in total, approximately 25,000 tons of crushed stone described as "non-stabilized open-graded drain layer" at $4.00 per ton at an estimated total price of $100,-000.00 (id.). One of the special conditions of this contract was that "deliveries will commence on October 1, 1988 at the minimum rate of 1000 ton per week until the project['s] winter shutdown in November 1988. The deliveries will resume on March 1, 1989 with the total quantity being on site by April 1, 1989" (id.). The contract also provided as another special condition— namely, that ESC would provide a $100,-000.00 performance bond to benefit the plaintiff should a default occur. Further, the contract provided that:

> [t]his Materials Purchase Contract, including these Terms and Conditions, the specifications applicable hereto and any additional terms and conditions incorporated into or attached hereto, constitutes the sole and entire agreement between the parties hereto. Sellers acceptance of this Materials Purchase Contract is limited to the terms and conditions hereof notwithstanding Seller's proposal/s or terms additional to or different from those set forth in this Materials Purchase Contract. Changes will be binding only if in writing duly executed by Purchaser.

(id.). Last, the materials purchase contract between Green and ESC also included the following term,

> [f]ailure of Purchaser to insist upon strict performance of any of the terms and conditions hereof, or failure or delay to exercise any rights or remedies provided herein or by law, or the acceptance of or payment for any material/s hereunder, or any inspection or test, or approval of design, shall not release the seller of any of the warranties or obligations of this Materials Purchase Contract and shall not be deemed a waiver of any right

---

1. FIA filed a third-party complaint against ESC and its president, John Gilham, for indemnification based on an indemnification agreement. The third-party defendants do not appear to have responded to the third-party complaint.

of Seller to insist upon strict performance hereof or any of its rights or remedies as to any such material/s, regardless when shipped, received or accepted, or as to any subsequent default thereunder.

(id.).

Pursuant to the terms of the material purchase contract, ESC executed a performance bond with FIA as the surety (exh. A to the Plaintiff's Brief in Support). Under the terms of the bond, FIA agreed to be bound to Green in the penal sum of $100,000 for ESC defaults with respect to the above materials purchase contract. The bond provided that FIA "be given prompt written notice by the Owner [Green] of any default or proposed default by the Principal [ESC] unless Surety consents in writing" (id.).

Green now alleges in its amended complaint that ESC breached the materials purchase contract by not delivering any product to Green, despite Green's continued written and oral correspondence with ESC indicating Green's consternation regarding ESC's nonperformance. Green alleges that it notified FIA of the defendant's default, but that FIA neither completed performance on behalf of ESC or secured ESC's performance under the contract (*see* amended complaint ¶ 11). According to Green, it therefore had to turn to another source to get its stone at a higher price and with further expenses incurred (id. ¶ 12). Green further alleges that it demanded the penal sum, $100,000.00 of FIA, but FIA has not paid it (id. ¶¶ 14–15). In this action, Green seeks, among other things, damages from FIA based on this breach.

On February 26, 1990, the plaintiff filed a notice of motion for partial summary judgment, seeking judgment on the count-one breach-of-contract (bond) claim. On March 20, 1990, FIA filed a notice of cross-motion for summary judgment with respect to both counts of the complaint.

## DISCUSSION

Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law". Of course, it is axiomatic that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

■ An issue is "genuine" "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510; *see Williams v. Borough of West Chester,* 891 F.2d 458 (3rd Cir.1989). In *Williams,* the United States Court of Appeals for the Third Circuit defined the amount of evidence necessary to make an issue "genuine." The appellate court explained that the affirmative evidence adduced by the nonmovant in opposition to the application, regardless of its direct or circumstantial nature, "must amount to more than a scintilla [, a mere trace], but may amount to less (in the evaluation of the court) than a preponderance." 891 F.2d at 460–61, 464. As to materiality, the substantive law will identify what facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510 (*citing* 10A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 2725, at 93–95 (1983)). As indicated above, there are cross-motions for summary judgment pending. I will first turn to Green's application as I believe that my determination of it resolves the defendant's application, too.

■ A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317,

323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Green submits that it has satisfied this initial burden of production.

In this regard, Green first points to the materials purchase contract, which, according to Green, by its own terms could not be modified, save by a writing "duly executed by the purchaser [Green]" (*see* Plaintiff's Brief in Support, at 12 (citing exh. B attached to this Brief)). Green thus posits that the contract was unchanged for it is agreed by the parties that there was no writing changing the contract (*see* Defendant's Answers to Interrogatories No. 10). Green asserts that the materials purchase contract thus called for weekly deliveries of at least 1,000 tons of stone commencing on October 1, 1988 until winter shutdown, and then, starting up thereafter on March 1, 1989 with the total amount being at the site by April 1, 1989 (*see* exh. B. to the Plaintiffs' Brief in Support). Green submits that when it found itself not receiving the goods that it had ordered, it began corresponding with ESC to ascertain the whereabouts of the stone. These correspondences stretched from October into December, 1989. Typical of these correspondences was the October 24, 1988 letter from Green's Project Manager, Mr. William G. McPherson to the attention of ESC's President, Mr. John Gilham. That letter read,

> We are now into the fourth week of October and to date we have received no open graded drainage layer material onsite. As per [the contract], at this point in time we were to have 3000 ton in stockpile onsite.
>
> We would like to know what your proposed schedule to correct this shortcoming is and how you intend to maintain the schedule in the future so we are not hindered with material shortages.
>
> Your response in writing should be in this office no later than the end of business on Friday, October 28, 1988.

(exh. 3 attached to the Plaintiff's Brief in Support). Green submits that it received no written responses from ESC to any of its warning letters written between October, 1988 and January, 1989. Green further submits that in its November 8, 1988 letter, it notified ESC that Green would hold ESC in default, stating,

> Green Construction Company has grave concern as to your ability to perform in the production and delivery of this material in a timely manner to meet with the terms and conditions on the referenced MPC. Should you fail to meet your obligation, all costs incurred by Green Construction Company to develop another source and purchase said material will be charged to your account in accordance with the general conditions of our material purchase contract.

(exh. 5 to the Plaintiff's Brief in Support). Having received no deliveries of stone from ESC, Green informed ESC on January 13, 1989 that pursuant to the materials contract,

> Green elects to cancel the entire contract because ESC has failed to give Green adequate assurance of performance after written demand therefore by Green when reasonable grounds for insecurity existed, and, indeed, continues to exist. Said cancellation is due to the default of ESC in accordance with Paragraph 4 of the Contract and is not for the convenience of Green under Paragraph 5 of the Contract.

(exh. 9 to the Plaintiff's Brief in Support). Green further notified ESC that it would turn elsewhere to effect cover. Green further submits that on the same day, it notified FIA of the default and its consequent claim under the bond "for all loss, cost, damages, and expense relating from ESC's default" (exh. 8 to the Plaintiff's Brief in Support). Green brings forth further evidence that this breach damaged it in the amount of $116,408.23.

Hence, Green contends that it has brought forth evidence that it properly repudiated the materials contract; that it properly notified the defendant FIA of its claim under the bond; and that it is undisputed that it is entitled to recover on the bond based on the evidence that it has submitted.

Since I believe that this evidence satisfies the plaintiff's burden of production under

the law of summary judgment as the federal courts view it, it is therefore incumbent on the nonmovant (defendant FIA) " 'to present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " *Williams*, 891 F.2d at 460 (*quoting Liberty Lobby, Inc.*, 477 U.S. at 256–57, 106 S.Ct. at 2514). For the most part, in advancing its opposition, the defendant has not challenged the terms or operation of the bond, but instead has concentrated its opposition on the underlying materials contract. In this regard, the defendant has, among other things, submitted the affidavit of its President, John Gilham. Therein, Mr. Gilham indicates that he and Mr. McPherson, an agent of Green, agreed orally that the delivery of stone "need not commence immediately after entry of the contract, since the paving part of the project had not yet commenced and the stone was to be used as the paving underbase" (Gilham Aff. ¶ 6). Mr. Gilham explained further that,

> When I orally agreed with Mr. McPherson that I could hold off making deliveries of stone until either the winter of 1988–89 or the spring of 1989, when the stone was needed, I removed all of my crushing equipment from the site and awaited notification from Mr. McPherson, on behalf of Green Construction Company, as to when the stone was needed. In mid-December I received a letter addressed to ESC that operations at the site were to be closed down for the winter and all sub-contractors were to suspend operations. That letter, dated

December 14, 1988, is annexed to Plaintiff's Brief as Exhibit F 10. I understood from my previous oral agreement with Mr. McPherson that I would then be able to provide the stone pursuant to the contract, after the first of the year when the weather got warmer and the stone was required for the paving underbase.

(id. ¶ 7). Based on this modification, FIA asserts that there is a question for the trier of fact as to whether Green consented to a modification, "thereby giving ESC the right to expect that it would be allowed to finish its contract in early 1989." Defendant's Brief in Opposition, at 9–10. FIA has also asserted that there are questions here for the trier of fact concerning the propriety of the plaintiff's grounds for insecurity leading to the purported breach and the amount of damages. Last, FIA has asserted that as a matter of law this action is premature under N.J.Stat.Ann. § 2A:44–145.

As the United States Court of Appeals for the Third Circuit observed, assessing whether a nonmovant (like FIA) has carried its burden of demonstrating genuine issues of material fact in a particular case requires the court "to make difficult, fact-specific, perhaps somewhat arbitrary judgments." *Williams*, 891 F.2d at 460–61. I make this difficult judgment in the plaintiff's favor at this time.

 The substantive law that governs the plaintiff's application is the Uniform Commercial Code.[2] I draw on this body of

---

**2.** This matter lies in diversity. Thus, the parties should have specifically addressed the question of what substantive law applies to this action. *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). They did not. Nevertheless, under New Jersey choice-of-law law, "[u]nless the parties to a contract express a different intent, the law of the state which has the most significant contacts with the contract and the parties to that contract will be applied in determining its validity or interpretation." *McCabe v. Great Pacific Century*, 222 N.J.Super. 397, 399, 537 A.2d 303 (App. Div.1988) (*citing, e.g., State Farm Mutual Automobile Ins. Co. v. Simmons Estate*, 84 N.J. 28, 34–36, 417 A.2d 488 (1980)). New Jersey clearly has the most significant contacts with (1) the contractual relationships at issue here and (2) the parties (all of which at least do business in

New Jersey). I will therefore apply New Jersey law, and specifically, the New Jersey provisions of the UCC to this action.

The application of New Jersey law, however, presents a separate problem because with respect to certain of the UCC provisions at issue here, particularly the provisions concerning waiver and modification, there is little, if any, New Jersey reported precedent. In the absence of New Jersey Supreme Court precedent on point, I must predict how that Court would decide the issue, and, in doing so, I

> must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand [and] bear in mind, too, that [I] should

law, because liability on the performance bond is based in great part on the particular effect that I give to the materials contract (as the parties would agree, a sales contract governed by the UCC) and the defendant's purported claim of modification. N.J.Stat.Ann. § 12A:2–209, the New Jersey UCC section on modification, rescission and waiver, provides:

> (1) An agreement modifying a contract within this Chapter needs no consideration to be binding.
>
> (2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.
>
> (3) The requirements of the statute of frauds section of this Chapter (12A:2–201) must be satisfied if the contract as modified is within its provisions.
>
> (4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.
>
> (5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

The drafters of the UCC, through this section, changed the common law by (1) making modifications enforceable even if there was no consideration given and, pertinently for this action, (2) deeming enforceable written agreements that contracts could not be modified by the parties unless the modifications were reduced to signed writings. *See Wisconsin Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1286 (7th Cir.1986) (Posner, J.); *see also J.W. Goodliffe & Son v. Odzer*, 283 Pa.Super. 148, 153, 423 A.2d 1032 (Super.Ct.1980).[3]

not accord any particular "datum" more significance than would the [New Jersey] Supreme Court under similar circumstances.... *McGowan v. University of Scranton*, 759 F.2d 287, 291 (3rd Cir.1985) (citations omitted and quotation marks omitted). In this regard, one must remember that the overarching purpose of uniform laws is uniformity in application across the jurisdictions; particularly, with respect to the UCC, the creation of a uniform standard of commercial dealing throughout the several states and territories. *See* N.J.Stat.Ann. § 12A:1–102(2)(c); *see also A.J. Armstrong Co. v. Janburt Embroidery Corp.*, 97 N.J.Super. 246, 234 A.2d 737 (Law Div.1967). Accordingly, in interpreting New Jersey's version of the uniform code, I will not hesitate in referring to the judge-crafted law of other jurisdictions as I believe that the New Jersey Supreme Court would do so as well to promote uniformity in the Code's interpretation.

3. Judge Posner explained the reason for the break from the common-law rule with respect to the second departure from the common law—namely § 2–209(2),

> The common law did not enforce agreements such as section 2–209(2) authorizes. The "reasoning" was that the parties were always free to agree orally to cancel their contract and the clause for bidding modifications not in writing would disappear with the rest of the contract when it was canceled. "The most iron-clad written contract can always be cut into by the acetylene torch of parol modification

supported by adequate proof." *Wagner v. Graziano Construction Co.*, 390 Pa. 445, 448, 136 A.2d 82, 83–84 (1957). This is not reasoning, it is a conclusion disguised as a metaphor. It may have reflected a fear of such clauses, buried in the fine print of form contracts, were traps for the unwary; a sense that they were unnecessary because only modifications supported by consideration were enforceable; and a disinclination to allow parties in effect to extend the reach of the Statute of Frauds, which requires only some types of contract to be in writing. But the framers of the Uniform Commercial Code, as part and parcel of rejecting the requirement of consideration for modifications, must have rejected the traditional view; must have believed that the protection which the doctrines of duress and bad faith give against extortionate modifications might need reinforcement—if not from a requirement of consideration, which had proved ineffective, then from a grant of power to include a clause requiring modifications to be in writing and signed. An equally important point is that with consideration no longer required for modification, it was natural to give the parties some means of providing a substitute for the cautionary and evidentiary function that the requirement of consideration provides; and the means chosen was to allow them to exclude oral modifications. 781 F.2d at 1286.

██ The defendant has contended that the parties orally modified the terms of delivery, but has conceded that there was no signed writing with respect to this purported modification. There being no writing, I conclude that as a matter of law there could not be a valid modification because the materials contract specifically provided that "[c]hanges will be binding only if in writing duly executed by the Purchaser" (exh. B attached to Plaintiff's Brief in Support). *See, e.g., J.W. Goodliffe & Son*, 283 Pa.Super. at 154, 423 A.2d 1032; *see generally* Comment 3 to UCC § 2–209 ("subsection 2–209(2) permits the parties in effect to make their own statute of frauds as regards any future modification of the contract by giving effect to a clause in a signed agreement which expressly requires any modification to be by signed writing"). Moreover, according to N.J.Stat.Ann. § 12A:2–209(3), the statute of frauds (§ 2–201) must be satisfied if the contract as modified is within its provisions. N.J.Stat.Ann. § 12A:2–201(1) provides that,

> Except as otherwise stated in this section[4] a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of the goods shown in such writing.

Since the contract and the purported modification of the contract are both for a price over $500.00, the purported oral modification of the materials contract is also ineffective because it does not comply with the UCC's statute of frauds. *See Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F.Supp. 978, 982 (S.D.N.Y.1985) (§ 2–209(3) requires that a modified contract comply with the statute of frauds); *Symbol Technologies, Inc. v. Sonco, Inc.*, 36 U.C.C.Rep. Serv. 402, 405–06 (E.D.Pa.1983) (U.S. Magistrate Naythons) (for the same proposition); 2 W. Hawkland, *Uniform Commercial Code Series* § 2–209:04, at 135 (1982) ("Section 2–209(3) recognizes that a modified contract is a new contract that may fall within the scope of the statute of frauds"). Accordingly, since the purported oral modification would not comply with the contract's or the UCC's statute of frauds, the defendant's opposition based on a purported oral modification to the plaintiff's motion for summary judgment is without merit.

██ This determination, however, does not end my inquiry for the UCC is clear that while an attempt at modification may not satisfy subsections 2–209(2) & (3), it can still operate as a waiver. *See* N.J.Stat. Ann. § 12A:2–209(4); *see also Double–E Sportswear Corp. v. Girard Trust Bank*, 488 F.2d 292, 295–97 (3rd Cir.1973) (Pennsylvania law); *Moldex, Inc. v. Ogden Eng'g Corp.*, 652 F.Supp. 584 (D.Conn.1987).[5]

---

**4.** I note that, on the record before me now, the exceptions, *see* N.J.Stat.Ann. §§ 12A:2–201 (2) & (3), are inapplicable to this action.

**5.** Modification and waiver are different legal concepts, as Professor Anderson explained:

> Both waiver and modification are predicated upon an intent to depart from the terms of the original contract. They differ from each other, however, in that waiver is the result of the intention of the one party who would otherwise have a right to insist on adherence to contract terms or claim damage for departure therefrom, whereas modification is the result of the bilateral action of both parties to the sales transaction. Waiver is the surrender of a right to object, or protest, or claim damages by the person having the right to do so. Modification is the changing of the terms of the agreement which may diminish or increase the duty of either party as distinguished from the mere surrender of a right by one person against another.
>
> Waiver and modification may vary as to scope of operation. If the question arises after a part delivery, installment delivery, or part payment has been made, the question is presented whether only the delivery or payment already made is affected or whether the contract is also changed or modified with respect to the balance of the contract as of yet unperformed. By definition, waiver relates only to the surrender of claims as to past transactions or performances whereas modification alters the entire sales contract, embrac-

Subsection 2–209(4) "is intended [despite subsections 2–209(2) & (3)] to prevent contractual provisions excluding modification except by a signed writing from limiting in other respects the legal effect of the parties' actual later conduct." Comment 4 to UCC § 2–209. Courts have specifically found that both the contractual statute of frauds, *see Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 873–74 (10th Cir. 1981) (following majority of jurisdictions); *C.I.T. Corp. v. Jonnet*, 419 Pa. 435, 214 A.2d 620 (1965), and the UCC's statute of frauds, *see Double–E Sportswear Corp.*, 488 F.2d at 295–97, may be waived. *See also* 2 R. Anderson, *Uniform Commercial Code* § 2–209:39, at 333 (3d ed. 1982). Such waiver must be demonstrated by more than mere parol evidence; course-of-performance/conduct evidence indicating a waiver is necessary. *See, e.g., J.W. Goodliffe & Son*, 283 Pa.Super. at 154, 423 A.2d 1032; *see generally* 2 W. Hawkland, *supra*, § 2–209:05, at 137–38.[6]

■ In the instant action, the nonmovant (FIA) must bring forth affirmative evidence with respect to the course of dealing which indicates that there is a genuine issue with respect to the waiver of the contractual and UCC statute of frauds and the delivery and amount specifications of the contract. The statements of Mr. Gilham, indicating a changed agreement—the change being made orally—would not be enough under the law. The defendant has produced no other evidence of the parties' course of performance which would even colorably indicate that Green waived the contractual and UCC statute of frauds and the delivery and quantity provisions of the contract. In fact, the defendant has not denied that the plaintiff sent warning letters to ESC throughout the October to January period to comply with the contractual delivery schedule and minimum-delivery-amount term. Those letters clearly indicate that the plaintiff was holding ESC to the terms of the materials contract throughout the October through January period (*see* exhs. F–3, 5, 6 and 9 to the Plaintiff's Brief in Support). Accordingly, based on the evidence put forth, I believe that no reasonable juror could hold in favor of the defendant on the issue of waiver.

■ There being no question that the materials contract was unchanged, I must now focus on whether the materials contract as constituted on the date of signing, September 15, 1988, was breached by ESC. The plaintiff has brought forth evidence (1) that it had reasonable grounds for insecurity as to the ESC's performance—namely,

---

ing any unperformed part as well as performed part.
2 R. Anderson, *Uniform Commercial Code* § 2–209:7, at 319 (3d ed.1982).

**6.** Professor Hawkland explained the need for such an evidentiary requirement by way of a hypothetical. He wrote:

suppose the seller is obliged under a written contract containing a no-modification-unless-in-writing term to deliver 10,000 bags of sugar on July 1st. Suppose he telephones the buyer on June 30th and says: "I can make delivery tomorrow, July first, but it will be difficult for me to do so. I am calling to find out whether you really need the sugar on July first. If you do, I will get it there, but that will involve working my crew all night long. If you don't need it on the first, I would very much appreciate a short extension." To this request the buyer replies, "I don't really need the sugar on July first. If you get it to me on the third it will be o.k." The seller tenders the sugar on July 2nd and the buyer rejects on the grounds that it was delivered too late. When reminded of the phone conversation granting an ex-

tension, the buyer replies that this is not what happened; that he denied the seller's request for an extension; that, in any event, he did not want to run the risk of an adverse fact finding on this question and thus was asserting the protective features of the statute of frauds and the no-modification-unless-in-writing clause. How should the case be decided? I think the buyer should win.

If the seller is able to have the alleged oral transactions stated in the hypothetical above admitted as evidence, the protective features of sections 2–209(2) and (3) can be easily circumvented. This is an argument against allowing those sections to be waived by allegations of oral agreements. In addition, if the oral agreement was, in fact, made as contended by the seller, he can protect himself by making sure the extension agreement is put into writing. After all, he and the buyer have agreed that any effective modification would have to be put in writing, and they should be held to their own "house rule." Moreover, the courts have traditionally taken a dim view of attempts to waive the statute of frauds.
2 W. Hawkland, *supra*, § 2–209:05, at 137–38.

the complete lack of compliance with the delivery schedule and the earlier history of performance problems with ESC under an earlier contract (*see* McPherson Aff. ¶ 4);[7] and (2) that it sent letters asking for assurances that performance would be forthcoming, but such assurances were never given—there is no record that ESC responded to any of the October, November or December letter concerning its performance. According to N.J.Stat.Ann. § 12A:2–609(4), "[a]fter receipt of a justified demand[,] failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the case is a repudiation of the contract." It is clear, therefore, on the submissions before me that ESC defaulted on its obligations under the contract. FIA's only opposition with regard to repudiation is its statement in its Brief in Opposition that the issue of what were reasonable grounds for insecurity leading to the need for adequate assurance was a question solely in the province of the jury. *See* FIA's Brief in Opposition at 10. The defendant properly articulates the principle; whether a party has a reasonable ground for insecurity is indeed a question of fact. *See* 4 R. Anderson, *supra*, § 2–609:20, at 221; *see also* Comment 3 to UCC § 2–609. The defendant, however, has put forth no affirmative evidence indicating that a reasonable juror could find the plaintiff's grounds for insecurity as unreasonable. Thus, it cannot evade summary judgment based on this ground because it has not satisfied its burden of demonstrating a genuine issue of material fact concerning insecurity.

■ I therefore conclude that it is undisputed that ESC was in breach of its agreement to the plaintiff. Further, it is undisputed that the plaintiff notified the defendant of this breach under the bond (*see* exh. F–8 attached to the Plaintiff's Brief in Support) and that FIA has not paid ESC's debt under the bond. Hence, FIA is liable under the bond for ESC's debts with

respect to the breached materials contract up to the amount of the penal sum of the bond, $100,000 (*see* exh. A to the Plaintiff's Brief in Support).

■ Before reaching the issue of damages, let me note that FIA has raised one other defense which I find meritless as a matter of law. FIA submits that under N.J.Stat.Ann. § 2A:44–145, the plaintiff's action should be dismissed at this time. That statute reads,

> Any person to whom any money shall be due on account of having performed any labor or furnished any materials, provisions, provender or other supplies, or teams, fuels, oils, implements or machinery in, upon, for or about the construction, erection, alteration or repair of any public building or other public work or improvement, shall, at any time before the acceptance of such building, work or improvement by the duly authorized board or officer, or within 80 days thereafter, furnish the sureties on the bond required by this article a statement of the amount due to him.
>
> No action shall be brought against any of the sureties on the bond required by this article until the expiration of 80 days after the acceptance of the building, work or improvement by the duly authorized board or officer.

N.J.Stat.Ann. § 2A:44–145. The defendant asserts that the plaintiff's agent admitted that the highway project had not yet received the state's final approval. *See* Defendant's Brief at 13 (citing Fowler Aff. ¶ 6). Hence, per the defendant, the plaintiff is barred from bringing an action until 80 days after the state's final acceptance of the project.

I do not agree with the defendant's proposed application of this statute to the instant facts. The plain language of the statute indicates that it applies to persons who have performed labor or furnished supplies. New Jersey courts' interpretation of the statute also indicates that the

---

**7.** A party cannot rely on UCC § 2–609 as justification for its action unless it deems itself insecure. *See* 4 R. Anderson, supra, § 2–609:9, at 218. As is the case here, repetitive noncompliance and earlier performance problems with respect to other contracts have been found to be reasonable grounds for insecurity. *See* id., § 2–609:22, at 222.

limitation only applies to subcontractors or materialmen. *See Maurice E. Keating, Inc. v. Township of Southampton,* 149 N.J.Super. 118, 120–21, 373 A.2d 421 (App. Div.1977) (per curiam); *see also Samuel Braen's Sons v. Fondo,* 52 N.J.Super. 188, 192, 145 A.2d 145 (App.Div.1958) (Conford, J.). The plaintiff fits neither category, it is the general contractor. Moreover, the purpose of the 80–day provision is "to protect the security of the public body in the bond from depletion or impairment by prior actions against the surety 'before it is known whether the contractor has faithfully performed his contract with the public board or body.'" *See Samuel Braen's Sons,* 52 N.J. at 192, 145 A.2d 145 (*quoting Franklin Lumber Co. v. Globe Indemnity Co.,* 102 N.J.L. 9, 12, 130 A. 608 (Sup.Ct.1925), *aff'd,* 102 N.J.L. 715, 133 A. 919 (E & A 1926)). There is no evidence that the public is directly involved in this dispute; the dispute is an internal one of a contractor suing a subcontractor's surety. Hence, the defendant's argument based on this statutory provision is unavailing.

■ Turning to damages, the UCC provides that,

(1) After a breach ... the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages ... but less expenses saved in consequence of the seller's breach.

N.J.Stat.Ann. § 12A:2–712. Green puts forth evidence that it covered—that is, it entered into a contract to replace the lost stone with the lowest bidder, Passaic Crushed Stone (PCS) in January, 1989. The plaintiff purchased 19,899 tons of stone at $9.85 per ton for a total of $196,-004.23 (*see* Fowler Aff. ¶ 13). The plaintiff submits that due to ESC's failure to perform, it was damaged in the amount of $116,408.23. Green calculated this amount by taking the difference in price per ton between the ESC and PCS contracts and multiplying it by the number of tons actually purchased (id. ¶ 4). For its part, FIA submits that, at worst, it should only have to pay for the value of 11 weeks of stone deliveries (from October 1, 1988 to December 16, 1988, the day the project shut down for the winter). The defendant further submits that a trier of fact could look at the damages in some other manner, so that I should not grant summary judgment as to damages.

It is clear that the contract called for approximately 25,000 tons of stone at $4.00 per ton (*see* exh. B to the Plaintiff's Brief in Support). Hence, there is no basis for defendant's calculation of the damage figure based on eleven weeks of deliveries. The relevant calculation is based on tonnage and the contract clearly indicates approximately how much tonnage was due and at what price per ton. Moreover, the defendant has not disputed these figures.

The plaintiff has stated that in computing the costs of its damages, it took the difference in price per ton between the contracts and multiplied it by the number of tons actually purchased. Under the UCC's cover-damages provision, as stated above, the damages recoverable will be the difference between the contract price and the cost of cover, "together with incidental or consequential damages, less any expenses saved in consequence of the seller's breach." 4 R. Anderson, *supra,* § 2–712:10, at 455. The difference between the contract price (at $4.00 per ton) and the cover price (at $9.85 per ton) is $116,409.15 based on 19,899 tons of stone.[8] The plaintiff has calculated the amount at $116,408.23. Green has offered no evidence of other expenses, consequential damages, or amounts to be credited to ESC. ESC has offered no evidence of any amount to be credited to it against the difference between the contract price and cover. Accordingly, I will utilize the plain-

---

**8.** I note that the defendant has not disputed the reasonableness of the price of the covering transaction or the reasonableness of the timing of the covering transaction.

tiff-calculated amount as the amount of damages under the contract. I perceive no merit in the defendant's conclusory argument that a jury could calculate the amount of damages differently, without the defendant pointing to record evidence indicating *how* a reasonable juror might possibly perceive the damages amount differently (which the defendant has not done), keeping in mind that the UCC cover-damages provision governs here. Accordingly, the damages arising from ESC's breach of contract was in the amount of $116,408.23.

This does not end the damage calculation as it pertains to FIA, however. The bond states in no uncertain terms that "the liability of the surety for any and all claims ... shall in no event exceed the penal amount of this obligation" (exh. A to the Plaintiff's Brief in Support. The penal amount is $100,000.00 (id.). That is the amount of damages which FIA owes to Green.

## CONCLUSION

For the reasons above, I grant the plaintiff's motion for summary judgment on count one of the amended complaint in the amount of $100,000. I deny the defendant's cross-motion for summary judgment. The plaintiff will file a proposed form of order reflecting my decision.