Dr. Patricia C. **ELMORE**, Plaintiff,

v.

**CLARION UNIVERSITY OF PENNSYLVANIA, et al.,**
Defendants.

**Civil Action No. 1:CV-95-356.**

United States District Court,
M.D. Pennsylvania.

Aug. 6, 1996.

Robert S. Mirin, Harrisburg, PA, for plaintiff.

Linda Cadden Barrett, Office of Attorney General, Harrisburg, PA, for defendants.

**MEMORANDUM**

CALDWELL, District Judge.

This action arises from Plaintiff's employment with Defendant Clarion University of Pennsylvania ("Clarion").[1] Plaintiff was hired as an assistant professor in Clarion's Education Department for academic year 1992–93. She was appointed for a period of one year, as are all non-tenured employees, and was reappointed for the 1993–94 academic year. However, when she was not reappointed for academic year 1994–95, she instituted the instant action, advancing numerous federal and state law claims. We are considering the Defendants' motion for summary judgment which, for the reasons that follow, will be granted.

## I. INTRODUCTION

### A. The Appointment Process

The renewal process for non-tenured faculty members at Clarion is outlined in a collective bargaining agreement ("CBA") between the State System of Higher Education and the Association of Pennsylvania State College and University Faculties. A faculty member who wishes to be reappointed submits a copy of his or her curriculum vitae to the Evaluation and Tenure Committee of the faculty member's department.[2]

Additionally, the faculty member is observed each semester by two peers from his or her department. These observations take place in regularly scheduled classes. An "observation report" is prepared by the observer and shared with the faculty member. The reports then become part of the documentation for the faculty member's annual review.

In addition, the faculty member's students complete an evaluation of the faculty member each semester. The results of these evaluations are tabulated, shared with the faculty member, and provided to the Evaluation and

---

1. The remaining Defendants include Dr. Diane Reinhard (the President of the University), Dr. Charles Duke (the Dean of the College), and Dr. Kathleen Smith (the Department Chair). In addition, Plaintiff sued James H. McCormick, Chancellor of the State System of Higher Education, and the Education Department Evaluation and Tenure Committee at Clarion, including its individual members. A stipulation of dismissal of all claims against McCormick was entered on May 14, 1996, pursuant to Fed.R. of Civ.P. 41(a)(1) and, in our Memorandum and Order of August 30, 1995, we deemed the Evaluation and Tenure Committee part of Defendant Clarion.

2. Reference to "faculty member" means a non-tenured faculty member unless otherwise indicated.

Tenure Committee for use in its annual review. The students are also permitted to complete responses which go to the faculty member and are not provided to the Evaluation and Tenure Committee or Department Chair unless the faculty member chooses to submit them. Finally, students have the right to register approval or disapproval of any instructor's performance by meeting with the instructor or communicating, orally or in writing, with the Department Chair and/or Dean of the college.

Other material may also be submitted to the Evaluation and Tenure Committee by the faculty member, including syllabi, tests, and handouts. The Committee examines the data and provides a written report concerning the faculty member's overall performance. It then submits its report and recommendation for renewal or non-renewal to the Department Chair.

The Department Chair also observes the faculty member and completes an observation report that is shared with the faculty member. The Department Chair reviews the report of the Committee, as well as his or her observation report, then makes a recommendation to the Dean of the College concerning renewal.

The Dean receives the Committee report and the Department Chair's report and reviews all documentation related to teaching performance. The Dean prepares a report on the faculty member for the Provost, who reviews all materials and forwards the information to the President of the University. The President reviews all available materials and issues a final decision on whether the faculty member should be reappointed.

### B. Academic Year 1992–1993

#### 1. The Committee

In the fall of 1992, Plaintiff submitted a curriculum vitae, peer evaluations, and her fall 1992 evaluations to the Department of Education's Evaluation and Tenure Committee ("the Committee") in order to be considered for renewal in academic year 1993–94. However, a problem arose when Plaintiff refused to sign the evaluation of Dr. Robert Baldwin, a member of the Committee. [SMF ¶ 46].[3] Plaintiff requested that the evaluation be voided, and insisted that any negative comments about her teaching be removed from the evaluation. [SMF ¶¶ 46–47]. In the Spring of 1993, Plaintiff refused to sign an evaluation by another faculty member, Dr. Richard Couch. [SMF 51]. In addition, Plaintiff's student evaluations for the fall semester were lower than those of Linda Payne, another new faculty member. [SMF ¶ 48].

The Committee recommended that Plaintiff be renewed, but suggested that Plaintiff review the student evaluations to identify strategies for change. [SMF ¶ 54]. In addition, each Committee member offered to consult with Plaintiff and provide her with assistance in teaching. [Id.]

#### 2. The Department Chair

The Department Chair, Dr. Kathleen Smith, observed one of Plaintiff's classes on October 28, 1992. [SMF ¶ 78]. She prepared a written description of her observation and provided it to the Plaintiff on December 5, 1992. [SMF ¶ 79]. However, Plaintiff refused to sign the evaluation. [Id.] In addition, Dr. Smith met with Plaintiff in December 1992, to discuss written student complaints she had received about the Plaintiff, and supplied Plaintiff with redacted copies of the complaints. [SMF ¶¶ 80, 82]. The complaints related to Plaintiff's treatment of students, her organization, and her preparation. [SMF ¶ 87]. During the meeting, Dr. Smith suggested that Plaintiff consider observing the teaching of other faculty members within the Department because that approach had been successful with another faculty member who experienced difficulties. [SMF ¶ 84].

---

**3.** We rely upon those statements of materials facts that have not been controverted by the Plaintiff. Local Rule 7.4 provides that a party opposing summary judgment must respond to the moving party's statement of material facts and that all material facts set forth therein "will be deemed admitted unless controverted by the statement required to be served by the opposing party."

On January 28, 1993, Dr. Smith prepared her first year evaluation of Plaintiff based on her classroom observations of Plaintiff, her contact with Plaintiff regarding student complaints, Fall 1992 peer observations, Fall 1992 student evaluations, the recommendations of the Committee, and Plaintiff's submissions. [SMF ¶ 88]. Dr. Smith stated that

> It is with reservation that I recommend Dr. Patricia Elmore for a second year of probationary service. In my opinion, it is imperative that students' perceptions of Dr. Elmore demonstrate marked improvement in the coming semester.
>
> I am further concerned that some type of resolution couldn't be reached in reference to the 2 observation reports submitted by Dr. Baldwin and myself, as this condition has the potential to impede faculty cohesiveness and strain colleague relationships.

[Defs.' R. at 408].

### 3. The Dean

The Dean of the College of Education and Human Resources, Dr. Charles Duke, has the responsibility to independently review each faculty member annually to determine whether that individual should be renewed for another year. [SMF ¶ 104]. The Dean considers the recommendation of the Committee, the Department Chair's evaluation, student evaluations, submissions by the faculty member, and any other data gathered by the Dean regarding the faculty member. [SMF ¶ 107].

Dean Duke prepared a draft of his evaluation of the Plaintiff for academic year 1992–93. [SMF ¶ 105]. The material he reviewed included the recommendations of the Committee and Dr. Smith, as well as the Fall 1992 evaluations of Plaintiff. [SMF ¶¶ 108–09]. In addition, Dean Duke took into account information he received from students in Plaintiff's class in the middle of the Fall 1992 semester. [SMF ¶¶ 109–110]. The students expressed concerns about Plaintiff's lack of organization, changing of assignment deadlines, and her attitude in responding to student questions. [SMF ¶ 112].

Dean Duke then met with Plaintiff to discuss his evaluation of her. [SMF ¶ 106].

During the meeting, he addressed Plaintiff's student evaluations, student complaints, and problems related to her teaching. [SMF ¶ 116]. In addition, he suggested methods for Plaintiff to incorporate into her teaching in order to correct some of her classroom problems. [SMF ¶ 117]. On February 25, 1993, Dean Duke forwarded his evaluation to the University Provost, wherein he recommended that Plaintiff be appointed for another year. [SMF 105].

### 4. The President

The President of Clarion University, Dr. Diane Reinhard, is charged with the responsibility of reviewing the performance of faculty members whose positions are renewed on an annual basis. [SMF ¶ 127]. The President reviews the Dean's report, the Department Chair's evaluation, the Committee's recommendation, as well as all other available data, including student evaluations, peer evaluations, and the faculty member's curriculum vitae. [SMF ¶ 128]. She then makes an independent decision on each faculty member's teaching status and determines whether that individual should be renewed. [SMF ¶ 129].

President Reinhard reviewed Plaintiff's performance for academic year 1992–93, and determined that she should be renewed. However, in her letter to Plaintiff on March 17, 1993, informing Plaintiff of her decision, President Reinhard urged Plaintiff to work with Dr. Smith or other faculty members to address areas of teaching weakness identified by students. [SMF ¶ 136].

### C. Academic Year 1993–94

### 1. The Committee

In the Fall of 1993, the Committee met to consider whether Plaintiff should be appointed for a third year. The Committee addressed a number of student complaints about Plaintiff's effectiveness as a teacher. [SMF ¶ 56]. One member of the Committee stated that students visited her office on a dozen occasions to voice complaints about Plaintiff. [SMF ¶ 57]. The types of complaints included:

the fact that [Plaintiff] was disorganized in class, she would not communicate with them, would fold her arms across her chest, turn her back and refuse to speak. Other students reported [Plaintiff] lost papers and confused assignments. Another student reported [Plaintiff] stopped her in the middle of a presentation and gave her a grade without listening to the entire report.

[SMF ¶ 58]. In addition, students complained to other faculty members, and were advised that the protocol was to seek out the professor to discuss concerns. [SMF ¶ 59]. Students were also told that he or she had the option of discussing complaints through the chain of command—the Department Chair, the Dean, the Provost, and the University President. [*Id.*]. The Committee reviewed the materials submitted by Plaintiff, as well as student evaluations, then recommended that Plaintiff not be renewed for a third year. [SMF ¶ 64].

### 2. The Department Chair

Dr. Smith, the Department Chair, observed a class taught by the Plaintiff in the Fall of 1993. [SMF ¶ 94]. In October 1993, Dr. Smith again received complaints from students about Plaintiff's teaching. [SMF ¶ 95]. Dr. Smith then prepared her second year evaluation of Plaintiff, reviewing all the materials submitted by the Committee and Dr. Elmore, along with her evaluation and contact with students, and recommended that Plaintiff not be renewed. [SMF ¶¶ 96–97].

On December 2, 1993, after Dr. Smith had made her recommendation but before a final decision was made by the President, several students complained to her about Plaintiff. [SMF ¶ 99]. In addition, Dr. Smith received written complaints from 21 students about Plaintiff between December 8, 1993 and December 17, 1993. [*Id.*]

### 3. The Dean

Dean Duke completed his second annual review of Plaintiff in December 1993, noting that "[h]er student ratings were the lowest for any instructor in the Department of Education and for any instructor under review in the College." [SMF ¶ 119]; [Defs.' R. at 126]. He also reviewed Plaintiff's peer evaluations, the recommendations of the Committee and Dr. Smith, and correspondence from the Plaintiff, and recommended that Plaintiff not be renewed for a third year. [SMF ¶ 120].

### 4. The President

Before President Reinhard reached a decision on Defendant's future with Clarion, she was visited by two students who complained about Plaintiff. [SMF ¶ 139]. During that meeting, President Reinhard inquired and was told that the students had already met with the Plaintiff, Dr. Smith, and Dean Duke. [SMF ¶¶ 140–142]. President Reinhard also reviewed Plaintiff's Spring 1993 evaluations and found her student ratings were low in many categories. [SMF ¶ 144]. The students' criticisms were directed at the quality of Plaintiff's teaching, her lack of preparation, and her ability to engage them in learning. [SMF ¶ 145]. President Reinhard then decided not to reappoint Plaintiff for a third year.

In March 1994, President Reinhard received a letter from Plaintiff charging Clarion with racial discrimination in connection with the decision not to reappoint her. [SMF ¶ 153]. As a result of this letter, President Reinhard directed Timothy Fogarty, Assistant Vice–President for Human Relations, to investigate Plaintiff's complaint. [SMF ¶ 154]. In addition, President Reinhard met with Plaintiff to hear her "point of view", and posed a number of questions to Plaintiff regarding her belief that the non-renewal decision was based on Plaintiff's race. [SMF ¶¶ 156–57].

As a result of this interview, President Reinhard asked Fogarty to obtain data regarding student evaluations for other faculty members, since one of Plaintiff's complaints related to the student evaluations. [SMF ¶ 159]. Fogarty then supplied President Reinhard with information concerning the student ratings of other African–American faculty and other faculty who had instructed in the courses taught by Plaintiff. [SMF ¶ 160]. In addition, Fogarty conducted interviews of faculty within the Department and with students from Plaintiff's classes and

prepared a series of reports for President Reinhard's review. [SMF ¶ 161]. The information she received did not cause President Reinhard to alter her decision.

Thereafter, Plaintiff instituted the instant action. In her amended complaint, Plaintiff advanced claims pursuant to 42 U.S.C. § 1981 (Count I), § 1983 (Count II), and §§ 1985 and 1986 (Count III), as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq (Count IV). She also included a claim under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. 951 et seq. (Count V), and state law claims for libel, slander, and invasion of privacy (Count VI).

Defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) and, on August 30, 1995, we granted the motion in part. We dismissed Counts I–III against Clarion and the employee Defendants insofar as Plaintiff sought monetary relief. In addition, we dismissed Plaintiff's Title VII claim (Count IV) against all Defendants except Clarion. Finally, we dismissed Plaintiff's PHRA claim (Count V) against all Defendants because Plaintiff failed to comply with the statutory prerequisites of that claim. Thus, the remaining claims and Defendants are as follows: Counts I–III against the employee Defendants in their official capacities, insofar as Plaintiff seeks equitable relief; Count IV against Clarion; and Count VI against Clarion and the employee Defendants in their official and individual capacities.

## II. LAW AND DISCUSSION

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89

L.Ed.2d 538, 553 (1986). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party...." Matsushita, 475 U.S. at 586–87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (citations omitted).

When a moving party has carried his or her burden under Rule 56, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to. the material facts...." Matsushita, 475 U.S. at 586–87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (citations omitted). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," and cannot "simply reassert factually unsupported allegations contained in [the] pleadings." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989) (emphasis in original) (citation omitted). However, "[i]f the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986) (internal citations omitted).

### B. Count I

In Count I, Plaintiff alleges a deprivation of her rights under 42 U.S.C. § 1981. Section 1981 forbids intentional discrimination based upon race in the creation and enforcement of contracts. See, e.g., Boykin v. Bloomsburg Univ. of Pennsylvania, 893 F.Supp. 400, 406 (M.D.Pa.1995) (Muir, J.), aff'd, 91 F.3d 122 (1996). Liability under section 1981 is personal in nature because it is premised on intentional discrimination. Id. "Conclusory allegations of generalized racial bias do not establish discriminatory intent." Id. (citing Flagg v. Control Data, 806 F.Supp. 1218, 1223 (E.D.Pa.1992)). Here, as in Boykin, the record is devoid of evidence that the race of the Plaintiff played any part in the Defendants' actions with respect to her non-renewal. Accordingly, Defendants are entitled to summary judgment on Count I of the complaint.

### C. Count II

■ In Count II, Plaintiff advances a claim pursuant to 42 U.S.C. § 1983.[4] Defendants maintain that they are entitled to summary judgment on this claim because, as a non-tenured public employee, Plaintiff did not have a protected property interest in her employment.

■ The Supreme Court has stated "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972). "The existence of a property interest in employment is a question of state law and is determined by the court as a matter of law." *McDonald v. McCarthy,* No. 89–319, 1990 WL 131393, *3 (E.D.Pa. Sept. 7, 1990), *aff'd,* 932 F.2d 960 (3d Cir.1991) (citations omitted); *see also Bishop,* 426 U.S. at 344, 96 S.Ct. at 2077, 48 L.Ed.2d at 690 ("the sufficiency of the claim to entitlement [to a property interest in employment] must be decided by reference to state law."). The employee Defendants argue that they are entitled to summary judgment on Count II because Plaintiff, as an at-will public employee, did not have a property interest in continued employment with Clarion.

■ It is undisputed that under Pennsylvania law public employees, such as the Plaintiff, are employees-at-will. *See, e.g., Cooley v. Pennsylvania Housing Finance Agency,* 830 F.2d 469, 471 (3d Cir.1987).

However, Plaintiff argues that she had a property interest in

the fair and proper application of the CBA [collective bargaining agreement] when considering her renewal. Because the CBA requires that probationary non-tenured faculty members be notified, in writing, of all the objectives required of them, and Dr. Elmore was never notified of the "fit" category, she was deprived of her procedural and substantive due process. Because the CBA required the committee to evaluate probationary non-tenured employees within the three categories listed in section XII, and the University was required to apply these categories exclusively to all past evaluations, Dr. Elmore was deprived of her due process as outlined in the CBA and guaranteed her through the Fourteenth Amendment. *Heck v. [Humphrey] Humphries,* [512 U.S. 477] 114 S.Ct. 2363 [2364] [129 L.Ed.2d 383] (1994).

[Pl.'s Br. in Opp'n at 23–24].[5] While Plaintiff's argument is far from a model of clarity, it appears that she is contending that she had a property interest in being reviewed for renewal exclusively on the factors listed in section XII of the CBA, and that if Defendants sought to use other factors she was entitled to notice of such factors. However, Plaintiff fails to establish how the CBA provides her with such a federally protected due process right to be evaluated only on the basis of the factors set forth therein. Thus, summary judgment will be granted in favor of the Defendants on Count II of the complaint.[6]

---

**4.** In her complaint, Plaintiff appears to contend that both her procedural and substantive due process rights under the Fourteenth Amendment were violated. However, she discusses only the alleged procedural due process violation in her brief in opposition to summary judgment. Insofar as Plaintiff is asserting that she had a substantive due process right in continued employment with Clarion, that argument must be rejected. First, Plaintiff has not established the existence of a property or liberty interest in retaining her position at Clarion. *See Midnight Sessions Ltd. v. City of Philadelphia,* 945 F.2d 667, 682 (3d Cir.1991). Moreover, there is nothing in the record to indicate that the Defendants' decision not to renew Plaintiff

was arbitrary, irrational, or unrelated to a legitimate governmental interest. *Id.*

**5.** Plaintiff also states that "Dr. Elmore clearly has a right to be free from racial discrimination and the procedural and substantive right described and outlined in the CBA." [Pl.'s Br. in Opp'n at 24]. Insofar as Plaintiff is arguing that the "right" that was violated was her right to be free from racial discrimination, such a claim would be preempted by Title VII.

**6.** Even assuming Plaintiff had a protected property interest in being evaluated based on the factors in the CBA, she has not established how she was denied due process. President Reinhard

## D. Count III

█ In Count III, Plaintiff alleges that the Defendants conspired to deny her equal protection of the law in violation of 42 U.S.C. § 1985(2).[7] However, section 1985(2), which involves obstruction of justice and intimidation of witnesses, parties, or jurors, has no relevance here.

█ In her brief in opposition to summary judgment, Plaintiff addresses Count III as though it alleged a violation of 42 U.S.C. § 1985(3), which prohibits individuals from conspiring to interfere with another person's civil rights. We note first that Plaintiff made absolutely no attempt to amend her complaint to advance such a claim, even though Defendants' motion to dismiss and motion for summary judgment made her aware that her complaint contained a claim under section 1985(2).

In any event, Defendants would be entitled to summary judgment on a claim under section 1985(3) because Plaintiff has not introduced a shred of evidence that would support her theory of a conspiracy based on her race. The "evidence" upon which she relies is the fact that the Committee, Dr. Smith, Dean Duke, and President Reinhard "all participated directly in using, applying, and furthering the 'fitness'/'fit' category in Dr. Elmore's non-renewal for the November 1993 evaluation." [Pl.'s Br. in Opp'n at 26]. Apparently, Plaintiff is referring to the recommendations of the Committee and Dr. Smith, which indicate that Plaintiff was not reappointed, in part, because of her lack of "fit" within the Education Department. That argument lacks merit without some indication that use of the term "fit" was a code word for racial discrimination. Plaintiff has produced no such evidence.

## E. Count IV

In Count IV, Plaintiff advances a claim under Title VII. She alleges that the decision not to renew her contract was the result of intentional discrimination based on her race. In addition, she maintains that Clarion has a facially neutral employment policy that results in a disparate impact toward minorities.

### 1. Disparate Treatment

█ In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the basic framework and burdens of proof in Title VII pretext actions.[8] First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. A prima facie case arises by showing that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the position; (3) plaintiff was discharged from or denied the position; and (4) nonmembers of the protected class were treated more favorably. *Id.*; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 504–08, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407, 415–16 (1993). However, the prima facie case is not rigid and should be adjusted to comport to the claims advanced and facts presented. *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir.1990) (citation omitted).

█ If the plaintiff succeeds in proving a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions.

---

made the decision to discharge her and, in doing so, did not rely upon Plaintiff's "fit". Plaintiff was afforded notice of the decision, was permitted to offer a rebuttal, and was afforded an explanation. Thus, Plaintiff received any "process" that she was due.

**7.** In addition, she contends that the Defendants violated 42 U.S.C. § 1986. A claim under section 1986 exists only if there is a violation of section 1985. *See Robison v. Canterbury Village, Inc.*, 848 F.2d 424, 431 (3d Cir.1988). Thus, if Plaintiff's section 1985 claim is dismissed, her section 1986 claim must also be dismissed.

**8.** Intentional discrimination cases are either "pure discrimination", "mixed motive" or "pretext" cases. Determining which type of case is presented depends upon the type of evidence a plaintiff produces. *See Hook v. Ernst & Young*, 28 F.3d 366, 374 (3d Cir.1994). A pretext case is presented where a defendant's facially legitimate reason for an adverse employment decision is false and merely a pretext for the true reason, discrimination. In this case, Plaintiff's evidence indicates that she is advancing a pretext claim.

*Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994). If the defendant carries its "relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Id.* (parenthetical in original). In order to establish pretext, and survive summary judgment,

> the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Id.* at 764 (citations omitted). We turn then to the application of these standards to Plaintiff's claim.

#### a. Prima Facie Case

■■■ Clarion first argues that Plaintiff cannot establish a prima facie case of racial discrimination because she cannot show that members of a non-protected class were treated more favorably. Specifically, Clarion points to Dr. Linda Payne who, for purposes of this action, is not a member of a protected class. Dr. Payne, like Plaintiff, was hired as a non-tenured Assistant Professor in the Education Department for academic year 1992–93. She too received low student evaluations and was not renewed after the 1993–94 academic year. Thus, Clarion contends, Plaintiff cannot establish that similarly situated non-protected faculty members were retained.

In response, Plaintiff offers a rambling argument that the criteria used by Clarion in determining whether the Plaintiff should have been renewed was improper. Plaintiff contends that the Defendants' consideration of her "fit" within the Education Department was in contravention of the collective bargaining agreement ("CBA"), which limits the criteria to: (1) effective teaching and fulfillment of professional responsibilities; (2) continuing scholarly growth; and (3) contribution to the university and community. As set forth below, the issue of whether the criteria set forth in the CBA were applied is not an issue with respect to Plaintiff's claim of racial discrimination. The issue is whether Plaintiff was subjected to intentional discrimination based on her race, not whether Clarion complied with the terms of the CBA.

Our review of Plaintiff's entire argument with respect to her prima facie case reveals only a single sentence that arguably addresses this point: "Dr. Perkins (PD 672), Dr. Tate (PD 351–459) and Dr. Watkins (PD 197–350) all indicated that this approach [use of the three factors listed in the CBA] has been consistently and exclusively used at Clarion University in the past with regard to faculty who were white." [Pl.'s Br. in Opp'n at 15].

■■■ However, Plaintiff's general reference to over 100 pages of Dr. Tate's deposition and over 150 pages of Dr. Watkins' deposition is wholly inappropriate. "Judges are not like pigs, hunting for truffles buried in briefs.... A litigant who fails to press a point by supporting it with pertinent authority or by showing why it is a good point despite a lack of authority ... forfeits the point." *Carpenter v. Vaughn,* 888 F.Supp. 635, 648 (M.D.Pa.1994) (McClure, J.) (citations and internal quotation omitted). Accordingly, we do not credit Plaintiff's assertion with respect to the testimony of Drs. Tate and Watkins.

With respect to Dr. Perkins, the only statement by him (on page 672 of Plaintiff's documents) that is in any way related to this issue is as follows:

> On the five occasions when I was evaluated I never saw the term "fit" or "compatibility" employed, nor to my memory was it a part of the evaluation process.

[Pl.'s R. at 672]. However, Dr. Perkins is African–American. Thus, the fact that the terms "fit" and "compatibility" were not used in his evaluations does not aid Plaintiff in establishing that those factors were not used in the evaluation of white faculty members. This would be required to prove her prima facie case.

Our review of the record reveals the existence of only one other employee who was

similarly situated to the Plaintiff, and that was Dr. Payne (who is a member of a non-protected class).[9] Like Plaintiff, Dr. Payne was not reappointed for academic year 1994–95. Because Plaintiff has not established that non-protected employees were treated more favorably, she has not established a prima facie case and Clarion's motion for summary judgment must be granted.

### b. Pretext

Even assuming Plaintiff could establish a prima facie case of racial discrimination, Clarion has set forth reasons that, if true, are a permissible basis for not continuing Plaintiff's employment. It maintains that President Reinhard decided not to renew Plaintiff because she concluded that Plaintiff was ineffective as an educator, and that President Reinhard's decision was based on a high number of student complaints in academic year 1992–93, low scores on student evaluations, a refusal to accept constructive criticism from peer evaluators, and student complaints during the Fall 1993 semester. [Defs.' R. at 244]. Thus, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Fuentes*, 32 F.3d at 763 (parenthetical in original). As noted, in order to survive summary judgment,

> the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than

not a motivating or determinative cause of the employer's action.

*Id.* at 764 (citations omitted).

██ Plaintiff has not introduced any evidence that could lead a trier of fact to disbelieve Clarion's proffered reasons or to believe that discrimination based on Plaintiff's race was more likely than not a motivating factor in the decision. She advances three arguments in support of her position, all of which must be rejected.

Plaintiff's first argument is so lacking in merit that it warrants little discussion. Plaintiff maintains that use of the terms "fitness" and "fit" by Clarion in making the decision not to renew her contract is evidence of a discriminatory animus based on race. Apparently, Plaintiff is referring to the Committee and Dr. Smith's use of those terms in their recommendations.[10]

In arguing that reliance on her "fit" within the Department was inappropriate, Plaintiff states that

> "Fitness" or "fit" is an extremely subjective criteria and capable of being used as a pretext toward exclusion of African Americans especially when fit into a virtually all whites milieu or environment is the issue. (viz. Does an African American to [sic] "fit" or integrate with the unit.) *Goulianos*, 41 Fair Empl.Prac.Cas. (BNA) at page 16–17 of attached. Application of such vague standard [sic] to a single other differently situated non-minority faculty member, such as Payne, is an inadequate basis for granting summary judgment based upon application of such a new, illegal standard. The very concept of diversity among minorities and whites within an academic unit runs contrary to "fit" or

9. Plaintiff makes broad assertions that she and Dr. Payne were not similarly situated, although she does not dispute the fact that both were first year probationary employees in academic year 1992–93. Further, Plaintiff has not pointed to any non-minority faculty member who received low student evaluations and was retained. In fact, Clarion has identified two white faculty members who were discharged due to low student evaluations. [Defs.' R. at 71–72].

10. Interestingly, Plaintiff overlooks the fact that President Reinhard (not the Committee or Dr. Smith) made the ultimate decision to discharge

Plaintiff. President Reinhard testified that her decision was based on the fact that "Dr. Elmore did not demonstrate that she was committed to quality teaching or to motivating students to learn. As an educator, Dr. Elmore had a primary responsibility to serve as a role model for future educators. The evidence before me demonstrated great inconsistency in her ability to achieve this goal." [Defs.' R. at 244]. Thus, it does not appear that Plaintiff's "fit" within the Department played a role in President Reinhard's decision.

"integration within the unit" raises issues as a criteria for employment evaluation. It is clearly arguable that the evaluation committee anticipated possible discrimination liability and chose to give its new category credibility by applying it to Dr. Linda Payne. The application of a new standard on an isolated basis to a single white faculty member who was not similarly situated to Dr. Elmore reflects (a) no validation of the use of the process; and (b) suggests a factual issue concerning pretext in an effort to obviate or obscure a racially biased decision. Further, Dr. Tate clearly states that the "fitness" consideration is illegal, illegally used, and illegally applied (PD 351–459). This evidence raised substantial factual issues concerning the treatment of Dr. Elmore under the "fitness" standard and are not resolvable in summary judgment posture.

[Pl.'s Br. in Opp'n at 19]. We reproduced this lengthy section of Plaintiff's brief in order to illustrate the nearly unintelligible nature of Plaintiff's argument on this point.[11] Insofar as Plaintiff is arguing that use of the term "fit" when making an employment decision is, without more, sufficient grounds for a jury to find pretext, we reject such an argument. Insofar as Plaintiff is contending that Clarion applied the "fitness" test to Dr. Payne, as well as Plaintiff, in an attempt to mask the true reason for its use with respect to Plaintiff (her race), that argument finds no support in the record.[12]

**11.** In support of her argument that summary judgment must be rejected because of Clarion's use of "fitness", Plaintiff also avers that

in a predominantly white institution (91% non-black student body), University and Department, with minority facility [sic] retention problems;[sic] the use of an improper, new, standard which adversely affected 50% (1 out of 2) minority professionals in a department with a 6.5% minority facility [sic] participation, in a University with approximately one (1) percent minority faculty, raises a triable question of race discrimination.

[Pl.'s Br. in Opp'n at 8]. We are unable to decipher the meaning of this argument. However, if Plaintiff is asserting that summary judgment must be denied simply because Clarion has a principally white student body and faculty, that argument is clearly wrong.

**12.** In essence, Plaintiff is claiming that Clarion: (1) discharged her because of her race, (2) fabricated the low student evaluations and lack of

Next, Plaintiff contends that Clarion's reliance on the student evaluations is evidence of pretext. She states that "Dr. Tate indicated that the Dean improperly and unscientifically gave student evaluations eighty to ninety percent of the weight in deciding to renew faculty, despite the CBA's requirement that evaluation properly involved three categories of which student evaluations are one of twenty six items [sic] sub-items included." [Pl.'s Br. in Opp'n at 20]. In addition to this statement *supporting* Clarion's position[13], Plaintiff fails to provide any citation to the record where Dr. Tate's testimony is located. In fact, in her entire argument on this issue, Plaintiff's only citations to the record are references to 100 pages of the deposition of Dr. David Tate. [Pl.'s Br. in Opp'n at 18, 21]. As set forth above, it is Plaintiff's responsibility to identify, with specificity, those portions of the record that support her argument.

Plaintiff also discusses inherent problems with the student evaluations and offers reasons why such evaluations are not reliable. Again, however, Plaintiff fails to identify any support for her argument in the record. Even assuming the student evaluations are unreliable, that fact does not support a conclusion that Clarion did not *actually* rely on them in deciding not to renew Plaintiff. The reliability of student evaluations in deciding who is or is not an effective teacher is simply irrelevant to the issue presented here.

"fit" as the reasons, (3) found a white faculty member who also had low student evaluations and "fitness" problems, and (4) terminated the white faculty member, setting forth low student evaluations and fitness as reasons, in order to cover up *its* racially discriminatory actions toward Plaintiff. To avoid summary judgment, Plaintiff must identify something in the record that would support the existence of such a nefarious scheme. This she has failed to do. .

**13.** If, as Plaintiff asserts, Clarion "gave student evaluations eighty to ninety percent of the weight in deciding to renew faculty", the fact that student evaluations were given significant weight in the decision *not to renew Plaintiff would support* Clarion's argument that its use of them was not due to her race but was the result of its normal process in reviewing non-tenured faculty.

Finally, Plaintiff attempts to cast doubt upon Clarion's assertion that she failed to accept constructive criticism from peers and refused to sign peer evaluations. Again, Plaintiff does not identify anything in the record that could lead a jury to conclude that Clarion did not rely on this factor.[14] Accordingly, Clarion's motion for summary judgment will be granted.

### 2. Disparate Impact

 In her brief in opposition to summary judgment, Plaintiff also purports to advance a claim for disparate impact under Title VII. In order to establish a claim of disparate impact, a plaintiff must first establish a prima facie case by showing "that the facially neutral employment practice had a significantly discriminatory impact." *Massarsky v. General Motors Corp.*, 706 F.2d 111, 120 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983) (citing *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130, 137 (1982)). If the plaintiff meets his or her initial burden, "the employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination.... Even in such a case, however, the [employee] may prevail, if he shows that employer was using the practice as a mere pretext for discrimination." *Id.* (citing *Teal*, 457 U.S. at 446–47, 102 S.Ct. at 2531, 73 L.Ed.2d at 137 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971))).

 Plaintiff's entire argument on this issue is as follows:

> Clarion University has 300 faculty members. Of the 300 faculty less than ten are African American. Within the Education department, at which Dr. Elmore taught, only two of thirty faculty were African American. The Department had difficulty retaining minority (black) faculty. Further, Dr. Elmore was teaching Multiculturalism to classes of fifty plus virtually white students, drawn largely from an area that is white, at a University which had recently settled a race discrimination complaint involving the provost office and John Shropshire. To give Dr. Elmore's student evaluations a ninety percent weight, in the evaluation process, and allow for the use of an apparently illegal category of "fitness" or "fit" within the department, in her evaluation, Clarion University used factors that appeared to discriminate against African Americans who seek employment, or renewal at Clarion University.

[Pl.'s Br. in Opp'n at 22–23].[15] Not surprisingly, Clarion had difficulty responding to this claim. Although it is not entirely clear what Plaintiff alleges is the facially neutral employment policy that, as applied, has a significant discriminatory impact, we presume she is complaining about the overall hiring and retention process at Clarion.

However, Plaintiff's claim must be dismissed because she has failed to establish a prima facie claim. As noted, Plaintiff must first show that the policy had a "significantly discriminatory impact." *Teal*, 457 U.S. at 446, 102 S.Ct. at 2531, 73 L.Ed.2d at 137. Plaintiff has simply offered raw numbers concerning the number of African American faculty members at Clarion University as compared to the number of non-minorities. Plaintiff cannot avoid summary judgment on a disparate impact claim merely by offering such generalized data. There is nothing to suggest that: (1) the number of African American on the faculty is lower than would be expected; or (2) that, assuming the num-

---

**14.** Throughout her entire brief, it appears that Plaintiff has failed to draw a distinction between illogical or unfair employment decisions and those based on impermissible factors such as race. This court does not sit as a member of a defendant's personnel staff and does not review the wisdom of a defendant's employment decision. Rather, our role is to determine whether a jury could conclude that the defendant lied about the true reasons for its decision or whether a jury could find that the defendant actually used an illegal factor in its decision. In this case, Plaintiff has failed to identify anything in the record that would permit such findings.

**15.** Once again, Plaintiff sets forth "facts" in her brief but fails to identify the portions of the record that support that argument. Here, we have located, we believe, the sections of the record upon which Plaintiff relies for the statistics she cites.

ber was low, it was the result of the hiring/retention practices.

The burden is not on Clarion to establish that there is no disparate impact as a result of its hiring and retention procedure, or on this court to scrutinize the record for evidence of a disparate impact. Rather, the burden is solely on the Plaintiff to establish that a facially neutral employment practice results in a significantly discriminatory impact toward African Americans. This she has not done and, as a result, she has not established her prima facie case. Therefore, summary judgment must be granted in favor of Clarion on Count IV insofar as Plaintiff advances a disparate impact claim.

### F. Count VI

Because we have granted summary judgment in favor of the Defendants on all of the federal claims, we will exercise our discretion not to address Plaintiff's state law claims for libel, slander, and invasion of privacy. 28 U.S.C. § 1367. We will, therefore, dismiss Count VI of the complaint.

An appropriate Order will issue.[16]

### ORDER

AND NOW, this 6th day of July, 1996, it is Ordered that:

1. Defendants' motion for summary judgment [Doc. No. 39], filed May 17, 1996, The motion is granted.

2. The Clerk of Court shall enter judgment in favor of the Defendants and against the Plaintiffs on Counts I–IV of the amended complaint.

3. Count VI of the amended complaint is dismissed pursuant to 28 U.S.C. § 1367.

4. Plaintiff's motion to strike Defendants' reply brief [Doc. No. 60], filed July 5, 1996, is denied.

5. The Clerk of Court shall close this file.

---

**16.** On July 5, 1996, Plaintiff filed a motion to strike Defendants' reply brief or, in the alternative, for leave to file a response to the reply brief. Plaintiff's motion is frivolous.